IN THE SUPERIOR COURT OF RICHMOND COUNTY

STATE OF GEORGIA

```
STATE OF GEORGIA              )
                             )
vs.                          )  Case No.:  2017-RCCR-1165
                             )
VAUGHN AUSTIN VERDI,         )
WILLIAM KREPPS,              )
EMILY STEPHENS,              )
                             )
      Defendants.            )
                             )
```

*MOTIONS HEARING*

Held before the Honorable J. Wade Padgett

Judge of the Superior Court, Augusta Judicial Circuit

In the Augusta Judicial Center

735 James Brown Boulevard, Augusta, Georgia

on Thursday, October 18, at 2:03 p.m.


APPEARANCES

```
FOR THE STATE:            Natalie S. Paine, Esq.
                          District Attorney
                          Geoffrey L. Fogus, Esq.
                          Chief Assistant District Attorney

FOR THE DEFENDANT/VERDI:  Robert T. Homlar, Esq.
                          Attorney at Law

FOR THE DEFENDANT/KREPPS:  Kelly R. Williamson, Esq.
                           Assistant Public Defender

FOR THE DEFENDANT/STEPHENS:  Danny L. Durham, Esq.
                             Melissa C. Bray, Esq.
                             Durham Law Firm
```

*KAREN K. CROMER, OFFICIAL COURT REPORTER*
*Augusta Judicial Center*
*735 James Brown Boulevard, Suite 4206*
*Augusta, Georgia 30901*
*(706) 849-3752 - Kcromer@augustaga.gov*

INDEX TO HEARING

Page

DEFENSE WITNESSES

Robert T. Homlar
    Examination by the Court                      10
    Examination by Ms. Williamson                 43
    Cross-Examination by Ms. Paine                35

Inv. Lucas Grant
    Cross-Examination by Mr. Homlar               45
    Cross-Examination by Ms. Williamson           67
    Direct Examination by Ms. Paine               64
    Re-cross-Examination by Mr. Homlar            70

Inv. Ryan Ferguson
    Cross-Examination by Mr. Homlar               74
    Cross-Examination by Ms. Williamson           80
    Direct Examination by Ms. Paine               83

Cawanna McMichael
    Direct Examination by Ms. Williamson          86
    Direct Examination by Mr. Homlar              91
    Cross-Examination by Ms. Paine                92
    Redirect Examination by Ms. Williamson        94


STATE'S WITNESS

Natalie S. Paine
    Examination by the Court                      97
    Cross-Examination by Mr. Homlar              107
    Cross-Examination by Ms. Williamson          116



CERTIFICATE OF THE COURT REPORTER                645

INDEX TO EXHIBITS

| Defense Exhibit No. | Description | Tender/Admitted |
|---|---|---|
| 1 | RCSO Policy and Procedures | 22/23 |
| 2 | RCSO CID SOP | 28/29 |
| 3 | Immunity Agreement for V.Verdi | 29/30 |
| 4 | Text Messages Homlar/Paine | 31/31 |
| 5 | Verizon - Homlar | 31/33 |
| 6 | Still Photograph of Interview Room | 32/33 |
| 7 | Copy of Maps | 33/34 |
| 8 | Copy of front of Disks V. Verdi #1 and #2 2/27/18 | 34/35 |
| 9 | Copy of State's Response to Defendant Motion to Dismiss or Other Remedies | 35/35 |

1        **P R O C E E D I N G S**

2            THE COURT:  All right, this is Case 2017-RCCR-1165,

3    *The State versus William Krepps, Vaughn Verdi and Emily*

4    *Stephens*.  Ms. Williamson, you represent Krepps; true?

5            MS. WILLIAMSON:  True.

6            THE COURT:  Mr. Homlar, you represent Verdi; true?

7            MR. HOMLAR:  Yes, sir.

8            THE COURT:  And, Ms.Bray and Mr. Durham, y'all

9    represent Ms. Stephens; true?

10           MR. DURHAM:  We do, yes, sir.

11           MS. BRAY:  Yes.

12           THE COURT:  Okay.  On September 21st, Mr. Homlar

13   filed a Defendant Verdi's motion to dismiss and other

14   remedies.  A little while later, Ms. Williamson filed the

15   same thing on behalf of Defendant Krepps.  I have not --

16   I'm not aware of any such filing on behalf of Defendant

17   Stephens.  Do y'all agree with that?

18           MR. DURHAM:  That's true at this time, Your Honor,

19   but we have not been able to complete full discovery and

20   we'll take that up a little later if need be.

21           THE COURT:  What do you mean?

22           MS. BRAY:  Your Honor, I haven't been provided all of

23   the audio disks, so I do not know if there is any

24   potential motion to dismiss regarding our client at this

25   point.

1          THE COURT:  Okay.  You haven't been provided all of

2     what audio disks?

3          MS. BRAY:  All of the audio/video disks for discovery

4     of this case.

5          THE COURT:  Okay, what do you think you are missing?

6          MS. BRAY:  There are a couple of disks that I know

7     one were not able to be copied when we had someone from

8     our office go down and make copies, so there are several

9     that were unable to be copied.

10         THE COURT:  Like a technical problem?

11         MS. BRAY:  Yes.

12         THE COURT:  Okay.

13         MS. BRAY:  And then there were two disks that were

14    missing, or not available when we went down and one of

15    those I was able to see very briefly the day until I was

16    told I could no longer look at it.  The other one I have

17    not been able to see at this point.  And I have never

18    received any type of discovery regarding Mr. Verdi and so

19    I have no idea if anything is discussed about my client in

20    that conversation, Judge.

21         THE COURT:  Okay.

22         MS. BRAY:  Nor do I know if there are any video

23    recordings out there of my client because she was taken to

24    the Sheriff's Office at some point when she was

25    represented by former counsel.  I don't know if any of

1          those exist at this point.

2               THE COURT:  All right. Lawyers, I -- Ms. Paine, are

3          you going to run with this one, or is it going to be sort

4          of a tag team unit, and who's going to be primary on

5          behalf of the State?

6               MS. PAINE:  Myself, Your Honor, that would be taking

7          over.

8               THE COURT:  Okay.  My understanding is that, at least

9          as it relates to Mr. Homlar's client, some of the dates

10         may be a different as to the others.  That the Defendant

11         was arrested on June the 12, 2017, that he was indicted

12         September 5th, 2017.  The allegation was that the

13         discovery was received on April the 24th, '18 by one or

14         all of the defendants, and then there was additional

15         discovery received in July of 2018.

16               Now, there are some portions of this that are

17         going to be awkward only because you have counsel who

18         needs to testify, and how do they -- do they just take the

19         stand and testify.  This is going to ultimately be the

20         movant's responsibility; the movant's burden of proof,

21         which in this case so far, in recognition of what Ms. Bray

22         just said, it would be Mr. Homlar and Ms. Williamson.  And

23         so I guess the only thing that concerns me is that if some

24         of these allegations are true, they constitute felony

25         crimes.  And I don't know who needs Miranda warnings

1          because I don't know what the contentions are relative to
2          who made the decision to record or share or not witness or
3          whatever.  So out of an abundance of caution, I probably
4          need to do it more broadly than more -- I guess
5          prophylactively than -- than individually.  Is
6          Investigator Grant here?
7                  MS. PAINE:  Yes.
8                  THE COURT:  Is -- there was another person who was
9          employed at the Sheriff's Office that I probably should
10         know by sight, but I do not, who came in the room as it
11         relates to Mr. Krepps when Mr. Krepps asked to go to the
12         restroom.  I do not know -- it's a white male, I do not
13         know who that is that escorted him to the bathroom and let
14         him come back.  I don't know if it was his decision, I
15         have no idea.  But I think that between -- the only people
16         that I saw on the video were you, Ms. Paine, Investigator
17         Grant and this other white male.  Do you know who I'm
18         talking about?
19                 MS. PAINE:  I have no idea either.
20                 THE COURT:  Do you happen to know, Investigator
21         Grant?
22                 INVESTIGATOR GRANT:  I don't, sir.
23                 THE COURT:  Okay, let me just do this.  Ms. Paine,
24         the last thing I want to is conduct this hearing, frankly.
25         I don't want to be any part of this any more than you want

1          to be a part of it.  But out of abundance of caution, can

2          we have a conversation where you indicate to me you're

3          fully aware of whatever rights you may have in this

4          regard?

5               MS. PAINE:  I'm fully aware of my Miranda rights,

6          Your Honor.

7               THE COURT:  Okay.  Investigator Grant, you also

8          probably had as much experience with Miranda warnings as

9          anybody else I know.  Can we agree that you are fully

10         aware of your Miranda rights as it relates to this event

11         and that you fully understand you have a right to not

12         answer a question if you don't want to?

13              INVESTIGATOR GRANT:  Yes, sir, I do.

14              THE COURT:  Okay.  Thank you very much.  Your burden,

15         your motion.  I'm going to make you go first and then I'm

16         going to let Kelly, excuse me, Ms. Williamson do whatever

17         she would like to do as it relates to the balance.

18         Proceed.

19              MR. HOMLAR:  Your Honor, I'll be testifying on behalf

20         -- in the motion.

21              THE COURT:  Why don't you come up here to the stand?

22              MR. HOMLAR:  Yes, sir.

23              THE COURT:  Do you have any objection if I ask some

24         at least directional questions?

25              MR. HOMLAR:  No, sir, I would not.

1          THE COURT:  Do you have any objection on behalf of

2      the State if I ask some directional questions?

3          MS. PAINE:  No.

4          THE COURT:  Okay.  Go ahead and have a seat.  Get as

5      comfortable as you can.  Whoever that is, handle it.  Hang

6      on one minute.  We have more people here than we have

7      seats.  If you are a member of the Public Defender's

8      Office, the D.A.'s Office, my staff, if you want to come

9      get in the jury box so that we can give people enough

10      seats, come on.

11          MR. HOMLAR:  And, Judge, we would ask to invoke the

12      rule.

13          THE COURT:  Just go have a seat.  Yeah, yeah, yeah, I

14      don't care.  I just want to give everybody an opportunity

15      to sit down if that's something they want to do.  Cawanna,

16      hang on just a second.

17          MS. WILLIAMSON:  And, Your Honor, we would be

18      invoking the rule as well.

19          THE COURT:  That's fine, and I'm sure the State is,

20      too.  Right?

21          MS. PAINE:  Yes, Your Honor.

22          THE COURT:  Who do you intend to call as a witness

23      other than yourself?

24          MR. HOMLAR:  Lucas Grant and Ryan Ferguson.

25          THE COURT:  Ryan Ferguson?

1          MR. HOMLAR:  That's correct, yes, sir.

2          THE COURT:  Do you anticipate calling any additional

3     witnesses, Ms. Williamson?

4          MS. WILLIAMSON:  I would be calling Ms. Cawanna

5     McMichael.  She was the attorney of record when this --

6     these events took place.

7          THE COURT:  Do you anticipate calling any witnesses?

8          MS. PAINE:  Yes, Your Honor.  Also in addition to the

9     ones previously mentioned, Chris Langford, Deb Young and

10    Pat Young.

11         THE COURT:  Who was the first one?  Chris Langford

12    and then who?

13         MS. PAINE:  Deb Young and then Pat Young.  And I've

14    already asked them to remain outside.

15         THE COURT:  And I'm sorry, I can't hear you very

16    well.  This room -- it's me, and I know it's me.  Give me

17    the third name.  I heard Deb Young --

18         MS. PAINE:  Pat.

19         THE COURT:  Pat Young.

20         MS. PAINE:  Yes.

21         THE COURT:  Is Ms. McMichael in here?

22         MS. WILLIAMSON:  I sent her out in the hallway, Your

23    Honor.

24         THE COURT:  Okay.  Is Investigator Grant in here?

25         MS. PAINE:  I've sent him out.

1          THE COURT:  And Ryan Ferguson?  I don't know who that
2     is.
3          MS. PAINE:  I sent him out, as well.
4          MR. HOMLAR:  He's out.
5          THE COURT:  Okay.  Chris, Deb, Chris Langford,
6     Deborah Young and Pat Young all out; right?
7          MS. PAINE:  Yes.
8          THE COURT:  Okay.  Make sure you don't discuss the
9     case with them or allow them to discuss it with you.  I
10     need you to be sworn.  Would you raise your right hand?
11     You can stay seated.
12     (Whereupon, the witness is administered the oath by the
13     Court.)
14                    ROBERT THOMAS HOMLAR,
15                    Having Been Duly Sworn,
16              Was Examined and Testified as Follows:
17                         EXAMINATION
18     BY THE COURT:
19     Q.   Tell me your name.
20     A.   Sure.  It's Robert Thomas Homlar.
21     Q.   And you are an attorney, admitted to practice law in
22     Georgia?
23     A.   I am.
24     Q.   And you represent which Defendant?
25     A.   I represent Vaughn Austin Verdi.

1       Q.   I don't know how long it has been since you have

2   reviewed your pleadings, and I'm sure that, between us, we can

3   probably find a way to get you a copy.  Is there anything in

4   the pleadings that you think was -- of what you filed that was

5   misstated, or that you need to clarify, or change off the top

6   of your head that is a factual allegation?

7       A.   I filed a motion in September and then I filed an

8   affidavit with the Clerk of Court recently.

9       Q.   On any of those, do you feel like you need to change

10  --

11      A.   Not to my recollection or knowledge, no, sir.

12      Q.   Okay.  Why was it that you ended up at the Sheriff's

13  Office on that particular date and time?

14      A.   Yes, sir.  On February 27th, I went to McDuffie

15  County.  I had a client who was turning himself into law

16  enforcement.  On the way back, I received a text message from

17  the D.A. indicating that I needed to contact her as soon as

18  possible.  I contacted her on my office cell phone.

19      Q.   And this was from Ms. Paine?

20      A.   Yes.  I contacted her on my cell phone and we had a

21  conversation about the statement that the co-defendant, William

22  Krepps, had made, or he had -- he'd been -- my understanding

23  is, from recollection was that he had been contacted by an

24  inmate in the lockup who had told him that they had some great

25  deal in place, that if he would provide information about the

1      murder he's alleged of that he would be able to, you know, get

2      a really great deal or some sort of resolution with the case.

3          Q.   Pull up to the microphone.

4          A.   Yes, sir.

5          Q.   You've got a little bit of trailing voice there.  So

6      you're under -- your conversation with Ms. Paine was that who

7      was going to make what statement?

8          A.   William Krepps is the co-defendant of Vaughn Verdi.

9          Q.   So that you thought -- you were told that Mr. Krepps

10     was to make a statement?

11         A.   Correct.

12         Q.   Okay.  How does that affect you?

13         A.   She also indicated that some maps had been found in

14     my client's cell indicating where the body might be located.

15     There's a missing victim in this case.  She indicated that Mr.

16     Krepps and my client were being brought down to CID to be

17     interviewed.  I kind of cut her off and said, "Well, why's my

18     guy getting brought down?" and she indicated, "Well, we're

19     going to keep them separate, but just come down here," and my

20     thought process was, well, if my client's going to be there,

21     I'm going to be there.

22         Q.   Okay, hang on one second.

23         A.   Yes, sir.

24         Q.   When you say "being brought down there," brought

25     where?

1       A.   400 Walton Way, the Police Headquarters.

2       Q.   The Sheriff's Office, CID Headquarters?

3       A.   Yes.  I went down -- well, within the conversation,

4   she's -- I made inquiry and said, "Well, you know, if he says

5   something that's off the wall, ridiculous, like that my client

6   had, you know, compelled him to commit the murder and that

7   there was, you know, facts that weren't, you know, credible or

8   consistent with the physical evidence in the case, he wouldn't

9   necessarily believe that and in providing some sort of deal to

10  him," and she indicated that was correct.  And basically, you

11  know, that was the nature of the conversation and so --

12      Q.   Did -- did you say that she told you you needed to be

13  there, or that was your decision?

14      A.   It was my decision to go.  I recall specifically

15  thinking, and I believe I said out loud, "If he's going to be

16  there, I'm going to be there."

17      Q.   Okay.  But did -- are you alleging the D.A. said you

18  had to be there, or you should be there, or you're --

19      A.   She did not, to my recollection, indicate I needed to

20  be there or should be there, but if he -- as I said, if I took

21  the position if he's going to be there, I'm going to be there.

22      Q.   You had been representing him for some time at this

23  point?

24      A.   I was hired by Vaughn Verdi's family on the night he

25  was arrested.

1     Q.   So your position, if the client was being -- was

2    going to talk to law enforcement, you were going to be there?

3     A.   Well, I was of the position that if he's going to be

4    at a location and law enforcement wants to consider talking to

5    him, then I certainly will be there.

6     Q.   Just to make the record clear, he had been in custody

7    since he was arrested, and he was arrested approximately when?

8     A.   It was last year.  I don't recall.  It may have been

9    over the summer.

10    Q.   I think you said in your motion he had been arrested

11   on June the 12th of '17.  Does that sound approximately right?

12    A.   That's sounds approximately right.  I couldn't say

13   the date for sure, but if it's in our motion, then I would --

14   it would have been taken from documents in my file and that

15   would be accurate, yes.

16    Q.   Approximately what time of day do you think you

17   arrived at the Sheriff's Office?

18    A.   It was after 9 a.m. probably even closer to 9:30 when

19   I got there.

20    Q.   And who, if anybody, did you see, and what happened?

21    A.   I entered CID, I talked to Investigator Lucas Grant.

22   Initially, I asked Investigator Grant in his office if he'd

23   brief me on the information they had had.  He indicated -- as I

24   recall, he indicated at that point that there were some maps

25   and maybe showed them to me.  I made specific inquiry about the

1   nature of what was going on and he said that Krepps was being

2   brought over and that Verdi was brought over.  I asked him

3   about meeting with my client, preferably in his office, or some

4   other office other than the investigative interview room

5   because I was aware that those rooms can be monitored and

6   recorded.  He said that, for safety reasons and for security

7   reasons, that couldn't happen and that it'd have to be in the

8   interview room.  Out of concern for my client, I asked if the

9   room would be -- I know the cameras are surreptitiously mounted

10  in there.  There's one in a little air conditioning unit on the

11  side and one, as I recall, it's up in the top corner.  I asked

12  specifically if those would be monitored and recorded while I

13  was in there and I was specifically told they would not be.

14       Q.   Okay.  So who specifically told you that?

15       A.   Investigator Lucas Grant.

16       Q.   So he indicated they would not be monitored or

17  recorded?

18       A.   That's correct.

19       Q.   Did you have a sense at that point whether you had

20  arrived before the other defendant's, co-defendant's attorney

21  had arrived?

22       A.   The impression I had, as I recall, because there's a

23  main hallway corridor in the CID.  As I recall, William Krepps

24  may or may not have been already in the center main hallway

25  interview room.  My client was in a side hallway interview

1    room, and -- or they weren't in the same interview room.  But I

2    went in and I talked to my client.

3         Q.   I will tell you just so that everybody is aware, I

4    have made an in-camera review of the recordings.  So there are

5    -- there are times that you had conversations with your client,

6    then you would leave the room, then you would come back, and

7    then you would -- there was a series of leaving, goings and

8    comings.

9         A.   That's correct.  I spoke -- I've -- I was a

10   prosecutor for 10 years.  I have a fairly good working

11   relationship with law enforcement, and when I was meeting with

12   my client, I could step out in the hall.  I felt like I was

13   unencumbered to walk around and talk to any investigators.  I

14   would go in Lucas Grant's office and, around the corner, there

15   was Investigator Ferguson who was one of the investigators

16   involved in this interview.  He had -- I don't know if it was

17   his desk or if it was a work station, but there was monitors on

18   each of the rooms and --

19        Q.   Wait, wait.  Clear that up.

20        A.   Yes, sir.  There was -- there's a television monitor,

21   security camera type monitor in each of the rooms so that they

22   were actively -- they were monitoring when people weren't in --

23   when I wasn't in the room.

24        Q.   All right, hang on.

25        A.   Yes, sir.

1          Q.   It was in whose office?

2          A.   It was -- Investigator Ferguson.  It was either his

3     work -- I don't know if it was a work station, like if that's

4     what it was set up for, or if that was where his desk was, but

5     when I wasn't in the room, my client was on video and you

6     could, you know, hear what was going on.  There were portions

7     of the day when Mr. Krepps was in the room when his attorney

8     was not present when the audio and video were up and you could

9     hear him.  He was, you know, exercising, he was doing pushups,

10    he was kind of, like, hyping himself up.  At one point, I made

11    a comment to Investigator Ferguson, because my client was

12    laying on a slab steel table, and as I recall, said something

13    to the effect of, "Does that guy look like someone who's

14    nervous about, you know, anything going on?"  And so when -- at

15    one point when the attorney for Mr. Krepps showed up, she went

16    into the room, Investigator Ferguson turned down the video and

17    turned down the audio and wasn't monitoring their conversation.

18         Q.   All right, hang on one second.  You were present in

19    Ferguson's office where the monitor was located when -- and I'm

20    sorry, I can't keep up with who's who.  Who -- when Ms.

21    McMichael --

22         A.   Ms. Cawanna -- Cawanna, yes.

23         Q.   Who represented who?

24         A.   Wayne Krepps at the time.

25         Q.   So, the attorney for Mr. Krepps, who is Ms. McMichael

1      --

2          A.   Yes.

3          Q.   -- at that time?

4          A.   Yes.

5          Q.   Showed up, you saw her in the hallway, or whatever --

6          A.   Yes.

7          Q.   -- not in the room?

8          A.   Yes.  As I recall, she -- I texted the D.A. to inform

9      her that the other attorney was there.

10         Q.   All right, hang on.

11         A.   Uh-huh.

12         Q.   You said Investigator Ferguson did what?

13         A.   Investigator was at -- I don't know if it was a

14     computer monitor or how it was involved, but he would turn down

15     the audio and turn off the video when the other attorney went

16     into the room.

17         Q.   Turned down the audio and turned off the video?

18         A.   Yes, so he couldn't see, as I recall, what was going

19     on.

20         Q.   When Ms. McMichael went into the room?

21         A.   Yes.

22         Q.   Did you stay there long enough to see Ms. McMichael

23     leave the room?

24         A.   Yes, she -- they --

25         Q.   What did Investigator Ferguson do when she left the

1  room relative to the monitor?

2       A.   When she -- as I recall, when she left the room, it

3  was turned up, so -- I mean I was told that it was for -- I

4  mean it makes sense that it was for the inmate's safety to make

5  sure they didn't harm themselves, or they weren't having any

6  sort of medical issues, or that they weren't, you know, waiting

7  to jump on someone when he walked into the room. But that was

8  the -- that was the impression I had.

9       Q.   And you were about to talk about something else, but

10  I just wanted to clear that up.

11       A.   Okay.

12       Q.   So you said something else happened.  Something about

13  you texting the D.A.

14       A.   Yeah, to let her know that the attorney for Mr.

15  Krepps had gotten there.

16       Q.   Does that mean -- should I assume from that that the

17  D.A. had not been there yet in this process?  She had not been

18  physically present?

19       A.   I don't specifically recall her being there initially

20  when I arrived.  She was there at the end when it was

21  determined that Mr. Krepps was not going to make any sort of

22  statement.  She was in the back hall with myself and

23  Investigator Ferguson.

24       Q.   Did you have occasion to see anyone, from the

25  Sheriff's Office, the D.A.'s Office, or anybody else live

1   monitor, if you understand what that phrase might entail --

2        A.   Uh-huh.

3        Q.   -- live monitor in a conversation between you and your

4   client, or Ms. McMichael and her client?

5        A.   No, I did not. As soon as it -- you could -- from

6   where Investigator Ferguson's work station, or office, or desk

7   was, you could hear the door open and close down the hall such

8   that he would hear it on the monitor and know that she was

9   coming out so the feed would go back up.  And I think I'd -- I

10  would -- I told him, you know, I could hear the door opening

11  and so the feed would go back up.

12       Q.   Is there anything else about the day in question that

13  you feel like you need to discuss?

14       A.   That specific day?

15       Q.   Kind of where I've -- I'm leaving you enough room --

16       A.   Yeah.

17       Q.   -- since you don't have anybody to ask you direct

18  examination questions.

19       A.   Yeah.  Well, I have some documents I would like to

20  introduce and I can lay a foundation for those.

21       Q.   Okay.

22       A.   Okay?  The first document I've marked as Defense

23  Exhibit 1 and --

24       Q.   Randy, can you -- can somebody help me get the

25  documents around?

1        A.   All right.

2        Q.   Defendant's Exhibit 1 is all of that?

3        A.   Yes.

4        Q.   What is that?

5        A.   It's the Standard Operating Procedures for Richmond

6   County Sheriff's Office.  The substantive sections that I

7   believe are applicable have been provided to the District

8   Attorney's Office and labeled as Exhibit 1 and 2.  There's a

9   record custodian affidavit attached to the back.

10       Q.   So Defendant's Exhibit 1 is the SOP.  What's the

11  relevant code section?

12       A.   I'm sorry, I don't have it in front of me, but --

13       Q.   Whatever this is?

14       A.   The portion I don't -- well, I have it tabbed on my

15  copy at the desk, but --

16            THE COURT:  Can somebody hand it to him?

17       A.   The relevant SOP is 5.5-9 regarding interview rooms

18  and detention cells.  The pages are not numbered.

19       Q.   (The Court) 5.5-9?

20       A.   Correct.

21       Q.   Okay.

22            THE COURT:  Any objection to Defendant's 1?

23            MS. PAINE:  No, Your Honor.

24            THE COURT:  Any objections?

25            MS. WILLIAMSON:  No.

1          THE COURT:  Mr. Durham, I'm not even going to treat

2     y'all as players unless and until something obviously

3     drags you in it; okay?

4          MR. DURHAM:  Thank you, sir.

5          THE COURT:  So, all right, so it's admitted without

6     objection.

7     Q.   You're saying 5.5-9 is the relevant code section?

8     A.   Yes.

9     Q.   What about that do you think -- I don't want you to

10     make an argument here, but --

11     A.   Sure.

12     Q.   -- what about it is relevant?  Or can you read it?

13     A.   Sure.  It outlines the policy and procedure that

14     Richmond County has adopted regarding recording and the

15     procedures involved. And it discusses how cameras are

16     available, as I recall.  Yes.

17     Q.   Can you read it to me?

18     A.   "Interview rooms may be utilized by..."

19     Q.   Do me a favor.  Keep up your voice; okay?

20     A.   Yes, sir.  (Reading)  Interview rooms may be utilized

21     by deputies/investigators for either a custodial interrogation

22     of arrestees or interviews of witnesses, victims, or suspects.

23     Any failure of cameras and/or audio recording system devices

24     will be immediately reported to a supervisor.  The interview

25     room may have desks, tables and chairs.  The procedures listed

below will be followed when utilizing the interview room for

custodial interrogations.  Prior to and after a custodial

interrogation, the deputy/investigator will visually and

physically check the room for the presence of weapons,

contraband or evidence.  Deputies/investigators will remove

their firearms and/or knives before the interrogation.  All

arrestees will be thoroughly searched for weapons, contraband

and evidence prior to being placed in the room.  No more than

one arrestee should be in a room at a time.  Under normal

circumstances, there'll be no more than three

deputies/investigators present during an interrogation.

Arrestees may be handcuffed prior to being placed in the room.

Handcuffs may be removed at the discretion of the

deputy/investigator that has physical custody of the detainee.

If there is any doubt as to the officer's safety, handcuffs

will remain in place.  Any arrestee placed in the interview

room will be secured in the designated chair.  All

interrogations will have at last one deputy/investigator in the

monitoring area.  The arrestees will be under constant visual

observation at all times.  The deputy/investigator will ensure

that the arrestee's personal needs are met.  Restroom, water,

et cetera.

If an evacuation becomes necessary due to a fire

alarm or actual fire, the arrestee/detainee will be evacuated

from the interview/detention room.  The procedures listed below

1    will be followed when utilizing the interview room for

2    interviews.  Prior to and after a non-custodial interviewer the

3    -- I'm sorry, interview, the deputy/investigator will visually

4    and physically inspect the room for the presence of weapons,

5    contraband or evidence.  Deputies/investigators will wear no

6    weapons during the interview with the victim or witness.

7    Deputies/investigators will remove their firearm or knife when

8    interviewing a suspect.

9         No more than one victim, witness or suspect will be

10   interviewed at a time.  Victims and witnesses will be asked to

11   leave their purses and packages in their vehicles.  If needed,

12   deputies/investigators may conduct a Terry frisk of all

13   suspects.  Suspects will be monitored at all times.  Witnesses

14   and victims will not be left alone in the room for extended

15   periods of time.  If assistance is needed, the monitoring

16   deputies/investigators will enter the interview room to assist

17   or offer help.

18        Q.   Is that all that you think is relevant to this?

19        A.   As I recall, yes, sir.

20        Q.   How did -- is there anything else that happened of

21   import before you received the discovery responses relative to

22   this issue?

23        A.   I believe their -- the discovery responses were

24   received on April 24th and July 12th.  I can remember those days

25   only because it's my birthday and my anniversary.

1        Q.   April 24th and what?

Q. April 24th and what?

A. July 12th.

Q. All -- everything thus far is 2018; right?

A. Correct.

Q. And so what was relevant about receiving discovery responses, if anything, on those dates?

A. Nothing. Those are just the dates that -- the point I received a written -- the written discovery responses initially, and then the audio discovery -- the audio disks on July 12th.

Q. The audio disks consisted of how many disks?

A. 107 disks is what I was told to bring. I -- well, initially, I brought down a stack of CDRs and I was told that I needed to bring DVD-Rs, so I ordered off of Amazon 125 disks to cover the amount and drop those off.

Q. And that response was given to you in July?

A. Correct. I gave -- well, I think I gave the disks to the District Attorney after I got the -- I ordered the disks. It was just kind of a swap. It wasn't -- my disks were copied.

Q. Oh, okay. Well, at some point in your -- something caused you to file this motion.

A. Oh. Oh, yes. After I got the disks, I -- I talked to my client at length and he's very close with his mother. She authorized me -- he authorized me to provide information to his mother about the case. Because of the volume involved, I

1    gave -- you know, I burned copies of the disks to my drive and

2    I gave her a thumb drive containing what we kind of refer to as

3    the greatest hits.  It seemed like the documents, or -- it

4    seemed like the audio statements and video statements that

5    seemed most pertinent to the case.  She and I -- she reviewed

6    the stuff and she called and asked and made inquiry about, you

7    know, the disks where I was meeting with Vaughn and I reviewed

8    -- I reviewed -- I reviewed that disk.  I saw -- then the

9    meeting I had with my client, and that's what prompted the

10    filing of this.

11        Q.   Why did you file it if you knew this room was

12    recorded?

13        A.   I was not aware that it was being recorded.

14        Q.   Were you -- did anyone tell you it was not going to

15    be recorded?

16        A.   Lucas Grant.

17        Q.   Is there any doubt in your mind on that point?

18        A.   There is not.

19        Q.   I know there's all kind of issues in this case, but I

20    want to keep this narrowly tailored to this issue.

21        A.   Yes.

22        Q.   Is there anything else that you need to tell me about

23    this incident, this motion that you think would even be

24    arguably pertinent to this motion?

25        A.   As far as --

1        Q.   Anything.  Let me ask you a question.  Did you

2    receive a discovery disk with Ms. -- that depicted Ms.

3    McMichael speaking with her client?

4        A.   I do not know. I have not taken the time to go back

5    and look and see.  As I recall, the way I was saving them to my

6    drive, I was labeling them by -- initially by witness involved,

7    whether it was Bryce Barnes or William Krepps or Vaughn Verdi

8    or Emily Stephens.  And then, inside those files, I was calling

9    each sub-file the name that is on the disk.  So -- and then I

10   was, in parenthesis, associating the Richmond County Sheriff's

11   Office evidence -- evidence, or the number they associate with

12   -- with disks when they file them in the file room.  So I have

13   not gone back to determine whether or not I have the disk

14   that's involved with Mr. Krepps.

15       Q.   Anything else that you want to tell me?

16       A.   Well, Judge, there's a few other exhibits that I'd

17   like to lay a foundation.

18       Q.   That's fine, go ahead.

19       A.   All right, Defense Exhibit 2 is Richmond County

20   Sheriff's Office Criminal Investigative Division's standard

21   operating procedures, and there's a certificate of authenticity

22   attached to that and it discusses protocol for interviews.

23            THE COURT:  Let me ask you, have you seen that?

24            MS. PAINE:  Yes, sir.

25            THE COURT:  Any objection to any of that being

1     admitted?

2          MS. PAINE:  No.

3          THE COURT:  Any objection?

4          MS. WILLIAMSON:  No, Your Honor.

5          THE COURT:  All right, it'll be admitted without

6     objection, D-2.

7     A.    Your Honor, Defense Exhibit 3 is an immunity

8     agreement for Vaughn Verdi he executed on August 3rd, 2017.

9     Q.    (The Court)  An immunity agreement with who?

10    A.    Vaughn Verdi.

11    Q.    Okay.  On what date?

12    A.    It was August 3rd, 2017.  My client was brought over

13    and granted, you know, essentially limited immunity under the

14    idea that he had information pertinent to the location of a

15    body in the murder case and he provided a statement to law

16    enforcement on that date with the D.A. present, and basically

17    provided all the information he had about the case to my

18    understanding.

19         THE COURT:  Have you seen that?

20         MS. PAINE:  Yes, I drafted it.

21         THE COURT:  Any objection?

22         MS. PAINE:  No, I just would like to know what the

23    relevance of having it admitted in this trial is or I

24    mean, in this hearing is.

25         THE COURT:  Do you have any objection?

1              MS. WILLIAMSON:  I'm sorry, I was speaking to

2         someone.

3              THE COURT:  Defendant's Exhibit 3, the immunity

4         agreement, any objection to that being made a part of the

5         record?

6              MS. WILLIAMSON:  No.

7         Q.   (The Court)  Can you help me a little bit with the

8    hook for --

9         A.   Sure.

10        Q.   -- relevancy?

11        A.   As far as the -- well, Investigator Grant to the

12   point, it shows kind of a motive or bias when he introduces --

13   when he brings Mr. Verdi over in February and Mr. Verdi has

14   already provided all the information under an agreement that,

15   you know, essentially he'd become a witness instead of a

16   defendant.  And --

17        Q.   Wait now, I'm confused.

18        A.   Yes.

19        Q.   I thought the immunity agreement was August of '17?

20        A.   Yes.

21        Q.   Oh, okay, I had it as '18.

22        A.   Yes.

23        Q.   That's -- okay.

24             THE COURT:  I'm going to admit it for whatever

25        relevance it may be -- that it may have.

1      Q.   Anything else?

2      A.   Defense Exhibit 4 is the text messages back and forth

3  between myself and the District Attorney.

4           THE COURT:  Have you seen those?

5           MS. PAINE:  Yes, no objection.

6           THE COURT:  Will be admitted without -- do you have

7      any objection?

8           MS. WILLIAMSON:  No, Your Honor.

9           THE COURT:  Will be admitted without objection.

10     A.   Defense Exhibit 5 is cell phone records from my

11  billing records showing a call to the D.A.'s office, or the

12  District Attorney's cell phone on the morning and it reflects

13  the length of the conversation and the time of the

14  conversation.

15          THE COURT:  Have you seen that?

16          MS. PAINE:  Yes.

17          THE COURT:  Any objection?

18          MS. PAINE:  I would just ask that my phone number be

19      removed.

20          THE COURT:  Hang on a second.  Any objection?

21          MS. WILLIAMSON:  No, Your Honor.

22          THE COURT:  Can we agree as a group here, because it

23      really wouldn't be relevant to anything to --

24          MR. HOMLAR:  Black out.

25          THE COURT:  -- I guess black out, for lack of a

1          better word, all the phone numbers?

2               MS. PAINE:  Fine with me.

3               MR. HOMLAR:  Yes.  And, Your Honor, I redacted the

4          first three digits of it.

5               THE COURT:  On the exhibit?

6               MR. HOMLAR:  On what is the exhibit, yes, sir, and --

7               MS. PAINE:  I just want the whole thing --

8               MR. HOMLAR:  That's fine.

9               THE COURT:  And you can do it with yours, too, if you

10         need to.  Okay?

11              MR. HOMLAR:  Yes, sir, I will.  Yes, sir.

12              THE COURT:  But before it leaves here, let's do that;

13         okay?

14              MR. HOMLAR:  Yes, sir.

15         Q.   (The Court) And then, anything else?

16         A.   Defense Exhibit 6 is a still from the interview room

17    video showing my client and with the time and date on the

18    bottom.

19         Q.   Did that time and date stamp appear to be correct to

20    the best of your memory?

21         A.   To the best of my memory, yes, sir.

22              THE COURT:  Have you seen that?

23              MS. PAINE:  Yes.

24              THE COURT:  Any objection?

25              MS. PAINE:  I mean I don't have any way of knowing --

1          I -- I don't have any objection.

2               THE COURT:  Any objection?

3               MS. WILLIAMSON:  No.

4               THE COURT:  Admitted without objection.

5          Q.    (The Court)  Anything else?

6          A.    Defense Exhibit 7 is maps that Investigator Lucas

7     Grant had that he indicated were associated with my client.  He

8     said they were found in his cell.  At one point, I took the

9     maps.  He took -- he gave me the maps to go in and talk to my

10    client about.  It became -- it was obvious looking at them that

11    they're not in my client's handwriting based on correspondence

12    he and I have had.  They are on different paper than my client

13    had been provided by me, which is a bright yellow legal pad.

14    And, I mean, they are maps showing, presumably, where a missing

15    body is and, you know, I talked to Grant about that.  I said,

16    you know, why on earth would he need to draw a map to show him

17    where something is.  If he knows where it is, why would he do

18    two copies of it.  I went in, showed my client and just

19    confirmed that -- well, I went in and showed my client and we

20    discussed the maps along with everything else.  The nature of

21    the conversation I had with my client throughout this was I was

22    under the impression that there was no monitoring or recording

23    occurring while I was in the room and that we were engaged in a

24    protected attorney/client privilege conversation.  We discussed

25    the facts of the case, the merits of the case, evidence in the

1    case.  We had the conversation you're going to have when a

2    co-defendant is about to say that he did something or didn't do

3    something.  And I had a very frank and candid conversation with

4    my client.

5             Q.   And so you want to tender 7.

6                  THE COURT:  Any objection to 7?

7                  MS. PAINE:  No, sir.

8                  THE COURT:  Objection?

9                  MS. WILLIAMSON:  No.

10                 THE COURT:  Admitted without objection.

11            A.   Defense Exhibit 8 is a photocopies of the face of the

12   interview disks as I received them.  These are the disks that I

13   made copies of that are on my hard drive on my computer that I

14   provided to my client's mother and which were provided to the

15   Court to review in-camera.

16                 THE COURT:  Any objection on 8?

17                 MS. PAINE:  No, sir.

18                 MS. WILLIAMSON:  No.

19                 MS. PAINE:  I would just ask that the CDs be made

20        part of the record.  I mean under seal, I understand it'd

21        be up to Your Honor.

22                 THE COURT:  Yeah, I may do it under seal.

23            A.   And, Judge, I was going to -- well, at some point ask

24   that all the copies be accounted for and filed with the Court.

25            Q.   (The Court) I don't know how many that is.  I mean

1     how in the world would I know that?

2          A.   Well, the original physical disks.  I mean there's a

3     copy that I have.

4          Q.   Let's deal with one issue at a time.

5          A.   Okay.

6               THE COURT:  Defendant's 8 is admissible.  I had

7          planned to make those a sealed filing.  Frankly, I'm going

8          to have to gather them back up from -- this place where I

9          put stuff that's fairly secret.  So, okay.

10         Q.   (The Court) Anyway, anything else?

11         A.   Defense Exhibit 9 is just a copy of the State's

12    response to the motion.

13         Q.   Okay, the pleadings are probably in the record, but

14    I'll allow them.

15              THE COURT:  Do you have any objection to that?

16              MS. PAINE:  No.

17              THE COURT:  Do you have any objection?

18              MS. WILLIAMSON:  No, Your Honor.

19         Q.   (The Court) Is there anything else?

20         A.   I don't believe so.

21         Q.   That you need to talk about as a witness, not as an

22    advocate?

23         A.   I don't believe so.

24              THE COURT:  Okay.  Do you have any questions for him

25         on cross on behalf of the State?

1          MS. PAINE:  Yes.

2          THE COURT:  You may proceed.

3                        CROSS-EXAMINATION

4     BY MS. PAINE:

5          Q.   Mr. Homlar, specifically at what point where you told

6     by Investigator Grant that you were not being recorded?

7          A.   When I came into CID before I went and talked to my

8     client.

9          Q.   So, about what time?

10         A.   It was -- when I got there, I went to -- as I recall,

11    I went to Grant's office initially and I talked to him briefly,

12    and that's specifically what -- as I recall, we addressed.

13         Q.   Did he specifically use the phrase, "Not recorded and

14    not monitored"?

15         A.   I was focusing on recorded.  I presumed it wouldn't

16    be monitored, but he indicated recorded or monitored.

17         Q.   Okay.  And previously you mentioned that when -- you

18    were sitting with Investigator Ferguson, that when Ms.

19    McMichael went in the room with Mr. Krepps that the video was

20    -- or the monitor was turned off and it was muted; correct?

21         A.   That's my recollection, yes.

22         Q.   What evidence do you have that anything different

23    occurred when you went in the room other than the video?

24         A.   I don't know.

25         Q.   Okay.  What evidence do you have that anyone from the

1    Sheriff's Office or my office has observed that video at all?

2        A.   I -- I don't know.

3        Q.   Okay.  In terms of the -- when you arrived at CID, I

4    mean, do -- was I there when you arrived?

5        A.   I -- I don't recall.

6        Q.   All right.  With respect to your, I guess,

7    conversation, I mean, you've turned the videos over to the

8    Court; correct?

9        A.   I provided copies on a thumb drive.

10       Q.   Okay.  So you still retained all of the copies of the

11   CDs?

12       A.   I have the physical copy -- is under my control, yes.

13       Q.   And you're familiar with the practices at the

14   District Attorney's Office; you previously worked at the

15   District Attorney's Office here in Augusta; correct?

16       A.   Yes.

17       Q.   Okay.  And so would you have any reason, based upon

18   your prior experience, to believe that, in February of this

19   year, this far in advance of trial -- I mean the trial's not

20   scheduled till, I guess, at some point, maybe January of next

21   year, that -- I mean in the history of time, would we ever be

22   reviewing videos eight months prior to trial?

23       A.   Well, I -- well --

24       Q.   Would that be standard practice?

25       A.   I don't know.  I -- I --

1    Q.   Did you ever do that?

2    A.   Yes.  Yes.

3    Q.   Eight months prior to trial?

4    A.   Well, I mean, as soon as I got discovery and if it

5    was something this heavy, yes, I would.

6    Q.   Okay.  And you said there were 108 or 107 CDs in this

7    case?

8    A.   107, yes.  That's -- that's as I recall, yes.

9    Q.   All right, and isn't it true you had a conversation

10   with Investigator Grant between September 11th and September

11   12th regarding whose idea it was to record this?

12   A.   I emailed him about it because I was, like, you know,

13   "Hey, man, I got -- I got the recording of me and my client

14   meeting, like, what -- what is this?"

15   Q.   You thought it was my idea; correct?

16   A.   Well, I said, "Did Natalie suggest this?" as I

17   recall, and he indicated that, "No, Natalie Paine did not

18   suggest this."

19   Q.   And that was on the 12th that he said -- I think,

20   quote, you said, "Was that all Paine's idea?"

21   A.   Yes.

22   Q.   And he said no.

23   A.   Yes.

24   Q.   That it was policy; correct.

25   A.   He referenced it as being a policy, yes.

1     Q.   But you filed the motion anyway alleging that this

2   was my idea?

3     A.   Well, I -- I don't know that this was your idea.  I

4   just --

5     Q.   You don't have any evidence that this was my idea?

6     A.   I don't have any evidence that this was your idea.

7     Q.   In fact, prior to this situation in February, we had

8   discussed this case on multiple occasions in an effort to

9   basically assist your client?

10     A.   I --

11     Q.   Or mitigate his --

12     A.   Yes, we talked about the case at length, yeah.

13     Q.   And we met for two hours in a courtroom --

14     A.   Right.

15     Q.   -- in August of 2017?

16     A.   Yes.

17     Q.   And I extended him immunity?

18     A.   Yes.

19     Q.   I mean, so this case which was ultimately indicted in

20   September of 2017, the only thing after that that would have

21   been, I guess, of evidentiary value would, in fact, be the

22   location of Preston Overton's body; correct?  I mean at this

23   point?

24     A.   As far as missing evidence or --

25     Q.   Yes.

1          A.   I mean, I don't -- I don't -- I mean that's -- yes, I

2     mean, that's the big chunk of what would be -- support a murder

3     conviction in this case, yes.

4          Q.   What would -- let me ask you.  What would be my

5     motivation at this point in tricking -- somehow tricking your

6     client into having a discussion with you in an interview room?

7               THE COURT:  Let me say this.  I know you can't make

8          your own objections --

9               MR. HOMLAR:  Yeah.

10              THE COURT:  -- but that sounds speculation.  Can you

11         rephrase that?

12              MS. PAINE:  I want to know what my motivation -- what

13         does he believe the motivation would be to trick --

14              THE COURT:  I think that's a legitimate question.

15         A.   Okay.  Well, I mean, if he can find the location of

16    the body, then there may be other evidence surrounding the body

17    that would be -- you know, support the case.  It would give --

18    it would certainly give closure to the family.  There is -- I

19    mean it would -- there's a number of -- there's a number of

20    witnesses who have died.  There's three witnesses who have died

21    in this process, so having the location of the body, if it was

22    in proximity of Mr. Verdi's residence, if it was in the

23    proximity of Mr. Krepps' residence, if it was in some location

24    where you could pull video showing who was going over there, or

25    not going over there, I mean, yeah, that's -- it's a pretty

1    sizable chunk of evidence.

2         Q.   (Ms. Paine) The location of Preston's body?

3         A.   Yes.

4         Q.   So at this point then, I mean, you would acknowledge

5    that there is pretty overwhelming evidence in this case;

6    correct?

7         A.   As to my client, no.

8         Q.   Okay.  I mean weren't the bloody clothes determined

9    to be Preston and Chad Garner's located at your client's

10   residence?

11        A.   Well --

12             THE COURT:  Now, let me ask you this.  Is this

13        germane, you think, to this issue?

14             MS. PAINE:  Yes.

15             THE COURT:  Okay, I'm not going to allow that

16        question.

17             MS. PAINE:  All right.

18        Q.   (Ms. Paine) What way was your client prejudiced as a

19   result of this recording?

20        A.   Well, I think that he's maybe lost some faith in me.

21   I think if the content has been reviewed, then there are --

22   we're talking about things that are, you know, germane to the

23   case.  I mean I don't -- I feel like, I mean, when I go talk to

24   him now, we're more on edge.  There's a little bit more

25   distance there.  We go to the utility rooms in the Richmond

1    County Sheriff's Office jail and there's cameras overhead.  I

2    was meeting with a different client in Richmond County Jail and

3    the utility room was being occupied.  I was in a side meeting

4    room with him.  As soon as the utility room became available, I

5    was immediately directed to leave with my client into the

6    utility room, which was just concerning as to why or what was

7    going on.  So it's -- I mean it's -- that's essentially the

8    issues, I guess, the difficulty.

9         Q.   So which -- what is the prejudice to your client

10   there -- your -- to Vaughn Verdi, specifically?

11        A.   Well, I mean, we -- it's made talking to him a little

12   bit more awkward, more difficult.  We don't have the same kind

13   of candor that we had and, I mean, if any of the -- the

14   information on the disk is -- the information on the interview

15   disk is -- I mean, if I was a prosecutor and had obtained it

16   somehow, it was something under legitimate reasons, the things

17   he said would potentially be useful at a trial.

18        Q.   I mean, in what situation would there be the ability

19   to get that admitted into trial?

20        A.   I mean if it's a statement against interests.  If it

21   had been anybody but his attorney meeting with him and he had

22   made a statement that provided any sort of guidance that would

23   be useful, or any -- you could find -- if there was something

24   that was derived from it.

25        Q.   When you were previously employed by the District

1    Attorney's Office, you had the occasion to observe video and

2    recordings of people in the interview rooms at CID in Richmond;

3    correct?

4         A.   That's correct.

5         Q.   And isn't it true that they're historically recorded

6    from the moment that they walk in until the moment that they

7    leave?

8         A.   Yes.  In meetings with law enforcement, yes.

9         Q.   And, I mean, how often did you observe defense

10   attorneys in CID on interview in recordings?

11        A.   I believe, as I recall, there was -- there was --

12   it's been a while, but at one point there was a case I handled

13   where, as I recall, the attorney walked in to an interview

14   room.

15        Q.   And you would agree it's the exception, not the rule?

16   I mean --

17        A.   Oh, yes.

18        Q.   -- it's few and far between?

19        A.   Yes.  I mean attorneys don't typically go to the

20   Police Department to meet with their clients in the interview

21   room, no.

22        Q.   So how many years were you with the D.A.'s Office?

23        A.   I was with the Augusta D.A.'s Office a little over

24   five years, initially with --

25        Q.   How many times do you think you saw that?

1      A.   Maybe once.

2      Q.   Okay.  Thank you.

3           MS. PAINE:  I don't have any further questions.

4           THE COURT:  Do you have any questions you need to ask

5      him?

6           MS. WILLIAMSON:  I do.

7                         DIRECT EXAMINATION

8  BY MS. WILLIAMSON:

9      Q.   Mr. Homlar, back on February of 2018, do you recall

10  if you had Ms. McMichaels' phone number?

11     A.   I don't recall if I had it.  If I -- I believe I

12  would have had it because she was -- I was a prosecutor.  As I

13  recall, she was with the division when I was a prosecutor.  I

14  may have had it that way.  I think I had it that way.

15     Q.   Do you recall when you were informed that your client

16  was being brought over, do you know if you were made aware of

17  whether Mr. Krepps was also being brought over to CID?

18     A.   My understanding, he was being brought over and that

19  they would be kept separate in the transfer.

20     Q.   And did you contact anyone at the Public Defender's

21  Office to let them know that Mr. Krepps was also being brought

22  over to CID?

23     A.   Not as I specifically recall, no.

24     Q.   When you found out, I guess in going through the

25  discovery after you received the disks, that the conversation

1   between you and Mr. Verdi was recorded, did you ever contact

2   the Public Defender's Office after that?

3        A.   After I found the disks, I believe -- I believe I

4   called you, but --

5        Q.   Do you recall why?

6        A.   Just, I think, as I recall, to make inquiry if you

7   had a copy of the disk, or didn't have a copy of the disk, or

8   if I was the only one who got a copy, or what was going on.

9             MS. WILLIAMSON:  That's all I have, Your Honor.

10            THE COURT:  Anything else that any of that brings up

11        that you would say, I guess, by way of redirect?

12            MR. HOMLAR:  No, sir.

13            THE COURT:  Do you want to leave those exhibits with

14        the court reporter and return to counsel table?

15            MR. HOMLAR:  Yes, sir.

16            THE COURT:  Okay.  I've put you on the spot of being

17        first because your motion was filed first.  Do you want to

18        call a witness?

19            MR. HOMLAR:  Yes, sir, we call Lucas Grant.

20            THE COURT:  Investigator Lucas Grant, please.  You

21        can go ahead and have a seat.

22        (Whereupon, the witness enters the courtroom and takes the

23   witness stand.)

24            THE COURT:  Please raise your right hand.

25            (Whereupon, the oath is administered to the witness by the

1    Court.)

2          THE COURT:  You may put your hand down.  Please state

3      your name for the record.

4          THE WITNESS:  Lucas Grant.

5          THE COURT:  Please answer any questions the lawyers

6      may have.  He is your witness, so you may proceed.

7                INVESTIGATOR LUCAS GRANT,

8                Having been Duly Sworn,

9            Was Examined and Testified as Follows:

10                  CROSS-EXAMINATION

11   BY MR. HOMLAR:

12     Q.    Investigator Grant, you're the homicide investigator

13   assigned -- you're a Richmond County Sheriff's Office homicide

14   investigator; correct?

15     A.    Yes, sir.

16     Q.    You originally hired on with Richmond County

17   Sheriff's Office in 2011?

18     A.    2010.

19     Q.    Okay.  And you worked in the jail until 2012;

20   correct?

21     A.    That's correct.

22     Q.    You were assigned to handle the investigation of the

23   murder case involving Vaughn Verdi and William Krepps as

24   defendants; correct?

25     A.    That's correct.

1      Q.   Okay.  And just to give a kind of by way of brief

2    background, the evidence in this case against my client, Vaughn

3    Verdi, is kind of derivative evidence of -- with following --

4    Investigator -- or following William Krepps; correct?

5            THE COURT:  Hang on one second.  As much as I'm not

6         going to let the State ask a bunch of questions about the

7         facts of the case, I'm not going to let you do it either.

8            MR. HOMLAR:  Yes, sir.  Okay.

9            THE COURT:  Let's find -- if you tell me that -- if

10        you can tell me that that's something real critical to

11        whether or not it got recorded and why it got recorded or

12        whatever, I'll listen to you.  But until then, let's do it

13        the other way.  Let's ask fact questions.  Okay?

14           MR. HOMLAR:  Okay.

15     Q.   (Mr. Homlar) Bryce Barnes was a witness in the case

16   who indicated that William Krepps and Vaughn Verdi knew --

17   William Krepps told Vaughn -- told you -- I'm sorry.  Bryce

18   Burke -- Bryce Barnes told you that William Krepps told him

19   that Vaughn Verdi knew about this murder; correct?

20     A.   I don't recall him saying that.

21     Q.   Okay.  That was a recorded statement; correct?

22     A.   That was a recorded statement, yes, sir.

23     Q.   And Bryce Barnes is dead now; correct?

24     A.   He is deceased.

25     Q.   Okay.  And then at one point co-defendant Emily in

1    her forth statement to you indicated that there was some

2    connection between Krepps and Verdi; correct?

3         A.   There being a connection of what, sir?

4         Q.   The murder?

5         A.   I'm going to say no on that.

6         Q.   There was -- the victim's clothes were found in my

7    client's house; correct?

8         A.   Yes.

9         Q.   They were found two days later after my client called

10   to report that they'd been found; correct?

11             THE COURT:  All right, so you want to try this case?

12             MR. HOMLAR:  No, sir.

13             THE COURT:  All right, I am going to sua sponte

14        interject that I don't -- I am not going to try this case

15        kind of.

16             MR. HOMLAR:  Okay.

17             THE COURT:  So if you want to ask him questions about

18        recordings or not recordings, go ahead.  Otherwise, sit

19        down.

20        Q.   (Mr. Homlar) You did not have a great case against my

21   client prior to February of --

22             MS. PAINE:  Objection, Your Honor.

23             THE COURT:  Sustained.

24        Q.   (Mr. Homlar) Were you present when my client gave a

25   proffer on August 3rd, 2017?

1        A.    When he gave what?

2        Q.    A proffer; when you met with him in the courtroom on

3   August 3rd, 2017?

4        A.    Yeah.

5        Q.    Did you record that conversation?

6        A.    No.

7        Q.    Okay.  In that conversation, there it was -- there

8   was a use immunity letter indicating that anything he said

9   would not be able to be used against him; correct?

10       A.    Yeah.

11       Q.    And that if he said anything inconsistent with what

12  he -- the information he provided, then that -- then that

13  statement could be used to impeach him; correct?

14       A.    I can't say yes or no.  I mean that was discussed

15  between you and Ms. Paine.

16       Q.    Okay.  But that conversation was not recorded;

17  correct?

18       A.    No.

19       Q.    Does the Richmond County Sheriff's Office use

20  informants inside the jail?

21       A.    I can't answer for everyone, but if you're asking

22  when it comes down to myself, people do offer information, yes.

23       Q.    Has any informant that you are aware of approached

24  either -- any of the three of the defendants about engaging in

25  a conversation?

1          A.   I can't answer that.

2          Q.   Are you aware of any conversation that any informant

3     may have made, or had with any of the defendants?

4          A.   There have --

5               THE COURT:  Hang on.  Hold up, hold up, hold up.  Mr.

6          Homlar, one of two things is about to happen.

7               MR. HOMLAR:  Yes, sir.

8               THE COURT:  You're going to ask some questions about

9          recording or not recording or we're going to be done.

10              MR. HOMLAR:  Yes, sir.

11              THE COURT:  So -- so I'm not sure how this became a

12         discovery motion.

13              MR. HOMLAR:  I understand.

14              THE COURT:  Because that's what it feels like right

15         now.

16              MR. HOMLAR:  I'm moving along, Judge.

17              THE COURT:  And so -- and so I'm going to tell you

18         now, when you say, "I can't answer that," you really mean

19         you don't want to answer that; right?

20              THE WITNESS:  That's correct.

21              THE COURT:  Okay.

22              MR. HOMLAR:  Understood.

23         Q.   (Mr. Homlar) On February 26th of this year, maps were

24    found in my client's cell; correct?

25         A.   Yes, sir.

1       Q.   Who found the maps?

2       A.   One of the deputies at our jail.

3       Q.   Okay.  And did you get the maps?

4       A.   Yes, sir.

5       Q.   Where were the maps found in my client's cell?

6       A.   I really can't testify to that because I was only

7   told it was in his cell.

8       Q.   Okay.  Where are the maps currently?

9       A.   In the case file.

10      Q.   Have you processed the maps for fingerprints with Tom

11  Johnson or anything?

12      A.   No.

13      Q.   Whose idea was it to have Vaughn Verdi brought over

14  on February 27th to CID?

15      A.   Mine.

16      Q.   What -- what prompted that decision?

17      A.   Because of the map being located.

18      Q.   And William Krepps was also brought over; correct?

19      A.   Yes.

20      Q.   And whose idea was that?

21      A.   Mine.

22      Q.   Okay.  How many cell phones do you regularly

23  routinely carry?

24      A.   Me?

25      Q.   Yes.

1      A.   Two.

2      Q.   Okay.  And Judge, I don't want to say the telephone

3  numbers out loud, but can I approach the witness and make

4  inquiry to --

5           THE COURT:  Why don't you just ask the question.  Ask

6           the question without getting into the -- I mean if he

7           denies it, then we can do what we need to do.

8      Q.   (Mr. Homlar) Is one of the cell phone numbers --

9           THE COURT:  No, no, no.  No, no, no, no, no.  Ask him

10          the question, not is what is your number, did I call you,

11          did you call me, did somebody else call you?

12     Q.   (Mr. Homlar) Did you have my cell phone number in

13  February?

14     A.   Yes, sir.

15     Q.   And I had your cell phone numbers.  I had two

16  numbers?

17     A.   Yes, sir.

18     Q.   On the morning of the 27th, why -- did you call me?

19     A.   Did I call you?

20     Q.   Yes.

21     A.   No.

22     Q.   Did you call anyone -- did you call anyone -- who did

23  you call, if anyone, about the maps and what Mr. Krepps wanted

24  to do?

25     A.   Are you asking in regards of these two young men

1    sitting to my left?

2         Q.   Yes.

3         A.   Okay.  So I contacted Ms. Paine in reference to your

4    client asking for his attorney.

5         Q.   Okay.

6         A.   Ms. Paine then contacted you.

7         Q.   Okay.  You knew I was his attorney; correct?

8         A.   I did, yes, sir.

9         Q.   And did you ask about Mr. Krepps' attorney?

10        A.   Mr. Krepps said that he wanted his attorney, as well,

11   so Ms. Paine contacted his attorney.

12        Q.   Do you recall what time that you placed my client in

13   the interview room?

14        A.   Offhand, no, sir, I don't.

15        Q.   Okay.  If I told you -- well, if it was about 9:00

16   a.m. on the morning of the 27th, do you have any reason to

17   question that?

18        A.   I mean I wouldn't have any reason to question it

19   until I went and looked at the exact time.

20        Q.   Okay.  Did you -- when you found the maps, did you

21   read my client -- did you approach my client -- what did you do

22   when you found the maps and you found -- knew they were

23   associated with my client?

24        A.   Your client was transported to 400 Walton Way, which

25   is the Sheriff's Office.

1      Q.   Okay. Then what happened?

2      A.   Prior to him being placed in the interview room, a

3  recording, video and audio, was started.  I believe it was

4  interview room number two.

5      Q.   Okay.

6      A.   After that was started, your client was placed in the

7  room.  I believe I went in, read him his Miranda and he

8  requested his attorney.

9      Q.   So your statement under oath is you read Miranda to

10  my client?

11      A.   I believe I did read him Miranda, yes.

12      Q.   And that would be on the recording or it would not;

13  correct?

14      A.   Yeah, it would be on the video.

15      Q.   Is it a written Miranda form that you used?

16      A.   Yes.

17      Q.   Okay.  Do you have that in your case file?

18      A.   Yes.

19          THE COURT:  Let me make sure I'm clear.  The video

20      was started before Verdi -- Verdi is who you represent?  I

21      can't get it --

22          MR. HOMLAR:  Yes, I understand.  Yes, sir.

23          THE COURT:  Before Verdi was placed in the room?

24          THE WITNESS:  That's correct.

25          THE COURT:  Do you believe that you talked to Verdi

-54-

1          and got -- and got through a Miranda waiver, or he asked

2          for his attorney before you even got through a Miranda

3          waiver?  Or did you even -- I mean, is that what you were

4          saying?

5               THE WITNESS:  I'm not -- like with him being in our

6          custody, I believe I did re-read him his Miranda because

7          of what we had found.

8               THE COURT:  Would you have read him Miranda anywhere

9          other than inside the room after the video started?

10              THE WITNESS:  No.

11              THE COURT:  Do you think that you reached out to the

12         D.A. after you found out Verdi wanted his lawyer?

13              THE WITNESS:  Correct.

14              THE COURT:  Any other questions?

15         Q.   (Mr. Homlar) Do you recall what time you reached out

16    to the D.A.?

17         A.   No, I don't.

18         Q.   Was it the night of the 26th, or the morning of the

19    27th?

20         A.   It was the day he was brought down.

21         Q.   So, it was the 27th?

22         A.   If that's the day, yes.

23         Q.   What time did you make the decision to bring him

24    down?

25         A.   I -- I don't recall.

1      Q.   Is it fair to say that it takes -- how much time does

2    it typically take to, say, bring him down until someone gets in

3    the room?

4      A.   Just depends on if our transportation is busy or they

5    have someone to transport them, so I can't give you a definite

6    time.

7      Q.   Okay.  But physically, it takes more than 15 minutes

8    to drive from the jail to the room; correct?

9      A.   Yeah.

10     Q.   Do you recall talking to him the night of the 26th or

11   the morning of the 27th prior to him getting to CID?

12     A.   Who is "him"?

13     Q.   Oh, I'm sorry, Mr. Verdi.

14     A.   You're asking did I talk to him?

15     Q.   Yes.

16     A.   No.

17     Q.   Okay.  Was there a written Miranda form that he

18   signed and executed, did that indicate on there that it would

19   be recorded or not recorded?

20     A.   I'm sorry, what?

21     Q.   The written Miranda, do you have it here today?

22     A.   No, I don't have the form here today, no.

23     Q.   Okay.  There are certain forms that have -- that

24   indicate that the statement's going to be recorded or not

25   recorded?

1        A.    Are you asking did we read that to them?

2        Q.    When you read him the Miranda and he signed it, did

3    you use the form that indicated whether it was going to be

4    recorded or not recorded?

5        A.    On that form, I -- I don't believe it says anything

6    about being recorded.  I don't think so.

7        Q.    Okay.  And was the time -- would the time and date

8    stamp on the video be accurate as you recall?

9        A.    Yeah.

10       Q.    When I was meeting with my client beginning about

11   9:30/9:45, where were you?

12       A.    Where was I?

13       Q.    Yes.

14       A.    When you went in that room, I stood at the front desk

15   where the secretary is.

16       Q.    Do you recall what interaction that you and I had in

17   your office about interviewing -- meeting with my client in

18   your office instead of the interview rooms?

19       A.    No.

20       Q.    Do you recall me asking you if the interview room was

21   going to be monitored and recorded, or recorded?

22       A.    I do remember you asking about the room.  I can't

23   remember exactly what you said, but I do remember telling you

24   that when the defendant, prior to him being placed in the room,

25   that room is recorded because of safety issues.  Also, for when

1    we speak to them.

2         Q.   Okay. Is that standard operating procedure for

3    Richmond County?

4         A.   Yes, sir.

5         Q.   Okay.  Is that standard operating procedure for

6    Criminal Investigative Division?

7         A.   Yes, sir.

8         Q.   I'm going to hand you what's been marked and entered

9    into evidence as Defense Exhibits 1 and 2.  Can you turn to the

10   portion of that SOP that would indicate where recording happens

11   whenever anyone is in the room?

12        A.   Can I turn to it?

13        Q.   Yes.

14        A.   You just gave me a lot of stuff to look through.

15             THE COURT:  It's about three reams -- well, about a

16        ream and a half paper, three reams of paper.  Do you want

17        to give him a lead, or just make him flounder?

18             MR. HOMLAR:  No, no, sir.

19        Q.   (Mr. Homlar)  SOP for Richmond County Sheriff's

20   Office, 5.5-9 it addresses interview rooms and detention cells.

21        A.   5.9 what, sir?

22        Q.   5.5-9.

23             THE COURT:  I don't think there any page numbers on

24        it.

25             MR. HOMLAR:  There are not.

1    A.   5.9 what?

2    Q.   (Mr. Homlar) 5.5-9.

3    A.   5.5?

4    Q.   Yes.

5    A.   And dash what?

6    Q.   Nine.

7    A.   Okay.

8    Q.   Is there any portion of this that addresses

9    recordings?

10   A.   I mean it says here any failure of cameras, audio

11   recordings, systems, devices will be, you know, reported.

12   Q.   That's correct.

13   A.   I don't -- I don't understand what you're asking

14   here.

15   Q.   Well, you're saying that there's a policy in place

16   that says that all -- any time anyone's in the room, there's

17   always going to be a recording for safety purposes.  Where is

18   that?

19   A.   Oh, okay, so you're asking me if it's in this?

20   Q.   Yes.

21   A.   No, it's not in there.

22   Q.   Okay.  I also gave you Defense Exhibit 2, Richmond

23   County Sheriff's Office Criminal Investigative Division's

24   standard operating procedures.

25   A.   Okay.

1     Q.   Could you turn to page 20 in there?

2     A.   Okay.

3     Q.   Is there any portion of this that addresses

4  monitoring and recording for safety purposes whenever someone

5  is present in the room?

6     A.   Not from what I see, no.

7     Q.   Okay.  Can I draw your attention to page 22.

8     A.   Sure.

9     Q.   That is subsection D.

10     A.   Correct.

11     Q.   What does subsection D say?

12     A.   Video recorders are available in interview rooms.

13     Q.   Thank you.  And then subsection H underneath that?

14     A.   You want me to read it out loud?

15     Q.   Yes, please.

16     A.   Okay.  Whenever possible, interviews shall be video

17  recorded and audio recorded.  When used, the recording shall be

18  designated as evidence and shall be handled, labeled and stored

19  in accordance with the agency's collection of preservation of

20  evidence procedures.

21     Q.   Okay, thank you.  And maybe turn back to page 21,

22  under 15.2, suspects, subsection F.

23     A.   Okay.

24     Q.   Could you read that into the record?

25     A.   Yeah.  When interrogating suspects, it is preferred,

1    but not required, to have two agency personnel present of the

2    witness' the reading of Miranda rights, waiver of counsel and

3    statement.  Unless the interview is being recorded, and which

4    case, the word "recorded" will be written on the witness'

5    signature line.

6         Q.   Thank you.  The -- so, where do you derive the idea

7    that there's a safety protocol standard in place that requires

8    these rooms to be recorded at all times?

9         A.   Say it one more time.

10        Q.   Where do you get the idea that these rooms are

11   recorded for safety purposes at all times?

12        A.   So, with my experience and -- I mean there's been,

13   you know, multiple people that I've come in contact with that

14   have the capability of doing multiple things while in that

15   room.  So -- but I also have been advised of when a defendant

16   enters that room, or anyone enters those rooms that they are to

17   be recorded and someone will monitor it.  May not monitor it at

18   all aspects of the interview, but will be monitored.

19        Q.   Okay, but you're not specifically aware of any

20   Richmond County standard operating procedure that demands that?

21        A.   No.

22        Q.   And where are the cameras in these interview room?

23        A.   When you open the door, say this is the doorway, top

24   of the corner of the wall, and then there's also what appears

25   to be a thermostat in the room that is a camera.

1      Q.   There's -- by way of notice, there's no red light

2   that comes on or a visible camera, or any, you know, "Quiet,

3   recording" sign on the outside; correct?

4      A.   No.

5      Q.   In order to record in the interview room, is there --

6   what's the process for initiating the recorder in the interview

7   room?

8      A.   So we have to go in a separate room, which is where

9   all of the monitors are, and we'll place a DVD in the system.

10  We'll set it up where it says video in, you'll hit the okay

11  button.  Of course, at that time you'll start the recording

12  only where it's recording on the disk.  And then you have

13  another portion where you go in and you type in the case

14  number, type in the defendant's name, or witness, victim,

15  whoever it may be.  You then log onto the investigator that

16  will be conducting the interview, or setting up the system and

17  then you hit the okay button and it'll begin recording to the

18  hard drive.

19     Q.   And were you the investigator who initiated the

20  recording process on the 27th?

21     A.   I believe so, yeah.

22     Q.   It's my understanding that an inmate initiated a

23  conversation with Mr. Krepps that prompted him to reach out to

24  CID and want to come talk to law enforcement.  Is it safe to

25  say that that person was an informant working with the Richmond

1      County Sheriff's Office?

2           A.   No.  That person came to us.

3           Q.   And the maps were found in my client's cell.  Were

4      you ever able to determine who placed those maps in his cell?

5           A.   No.

6           Q.   Is there any aspect of an investigation that's going

7      to take place of the origin of the maps?

8           A.   Say that one more time.

9                THE COURT:  Hang on for a second.  How is this

10          relevant to the recording?

11               MR. HOMLAR:  Well, if the maps were placed there by

12          someone, then the identity of that person is important.

13               THE COURT:  In the criminal case, I agree.

14               MR. HOMLAR:  Well, in this case, as well, if that

15          person was working with police or an informant.

16               THE COURT:  Okay, it's clear that -- I am going to

17          sustain my own objection to that question and ask that you

18          confine your questions to things that would be arguably

19          relevant to the recording.

20               MR. HOMLAR:  Yes, sir.

21          Q.   (Mr. Homlar) After you recorded my client's

22     conversation with me, what did you do with the disk?

23          A.   The disk was turned into our file room, and that's

24     it.

25          Q.   Did it ever cause you pause or concern that this was

1      a recording of an attorney-client privileged conversation?

2             A.   Did it ever cause me what, sir?

3             Q.   Did you ever think, "Gee, maybe I shouldn't record

4      this," or, "Gee, maybe I shouldn't turn this in to property"?

5             A.   I never listened to it, so I don't know what's on it.

6             Q.   Well, that's not the question.  If the -- was the --

7      were you concerned that you were memorializing a conversation

8      between an attorney and a client?

9             A.   No.

10            Q.   Do you recall a conversation between yourself and I

11     about safety protocol and concern about inmates, you know,

12     lying in wait, or having medical issues, and that that was the

13     reason to monitor the -- the rooms?

14            A.   Do I recall saying what, now, sir?

15            Q.   Well --

16            A.   Or having a conversation about what, now?

17            Q.   When the attorneys were out of the rooms, the room

18     was being monitored by Investigator Ferguson; correct?

19            A.   I don't know if it was being monitored by him or not

20     at that time.  I do know that he was monitoring it that day.

21            Q.   Okay.  And in monitoring, what's the purpose of his

22     monitoring?

23            A.   To make sure that the defendant or inmate is not

24     causing harm to himself, trying to escape, anything.

25            Q.   So if someone was monitoring the room when an

1    attorney wasn't in there; correct?

2          THE COURT:  Restate that.  Was -- you weren't very

3       clear in your verbiage.

4       Q.   (Mr. Homlar) Okay, on the 27th when I was not in the

5    room, Ferguson, or someone, was monitoring that room; correct?

6       A.   Yes, I believe so.

7          MR. HOMLAR:  Okay.  Judge, I don't think I have any

8       questions.

9          THE COURT:  Okay.  Do you have anything -- I'll tell

10      you what, let's go -- I'm going to keep kind of going in

11      that order.  Do y'all have any questions for Grant?

12         MS. PAINE:  Yes.

13                         DIRECT EXAMINATION

14   BY MS. PAINE:

15      Q.   Investigator, you're the lead investigator on the

16   homicide investigation; correct?

17      A.   Yeah.

18      Q.   And so it would have been your responsibility to get

19   the CD out of the case cracker, the computers desk?

20      A.   Yes.

21      Q.   And put it in the file room?

22      A.   Yes, ma'am.

23      Q.   All right.  After the CD is removed from the

24   apparatus in which it's recorded, I mean, is it saved on the

25   software, or is it only saved on the disk?

1       A.   It's on the disk.

2       Q.   Okay.   So, in order for anyone to observe that disk,

3  or observe that interview, they would have to physically get

4  the disk?

5       A.   Yes, ma'am, they'd have to speak to our file clerk

6  and sign it out.

7       Q.   Okay.  And to your knowledge, has anyone -- other

8  than providing a copy to the District Attorney's Office, has

9  anyone in CID, to your knowledge, observed or had the occasion

10  to listen to that recording?

11       A.   No.

12       Q.   Or any of the other recordings from that day?

13       A.   No.

14       Q.   All right.  And was there anything derived from any

15  of the conversations had that day?

16       A.   No.

17       Q.   And at that point in the investigation, I guess what

18  was the -- what was your intent, or what was our intent, I

19  guess at that point?  What else were we looking for at that

20  point?

21       A.   The main thing we were looking for is Preston

22  Overton, but from that day, we didn't get anything from it.

23       Q.   All right.  And what prompted the maps being found at

24  -- in Vaughn Verdi's cell?

25       A.   A conduct of a search was done out at our jail.

1        Q.   The whole jail, or just Vaughn Verdi's cell?

2        A.   The entire thing.

3        Q.   Okay.  So, basically, just a shake-down at the jail

4   and coincidently turned up the maps in Vaughn Verdi's room?

5        A.   That's correct.

6        Q.   All right.  And as a result of that, you made a

7   decision to inquire -- inquire of him, I guess, of the maps?

8        A.   Correct.

9        Q.   All right.  Did I have anything to do with that?

10        A.   No.

11        Q.   All right.  And historically speaking, isn't it true

12   that when you place someone in the interview room, you record

13   from the moment that you put them in there to the moment that

14   they leave?

15        A.   Yes.

16        Q.   And is there any way to mute that function and

17   continuously record while the person is in there?  Like, are

18   you aware of how to -- specifically how to mute it other than

19   physically muting it on your computer?

20        A.   Correct.  That's the only way to do it, physically.

21   Yeah.

22        Q.   All right.  And so if you were to start and stop the

23   recording essentially you would have to create, like, a new CD;

24   it would break up the entirety of the interview; correct?

25        A.   Yes.

1           MS. PAINE:  That's all I've got right now, Your

2       Honor.

3           THE COURT:  Do you have any questions, Ms.

4       Williamson?

5           MS. WILLIAMSON:  Yes, Your Honor.

6           THE COURT:  You may proceed.

7                         CROSS-EXAMINATION

8   BY MS. WILLIAMSON:

9       Q.   Investigator Grant, you said initially that morning

10  that you were the one that put the disk, I guess, in the

11  electronic device to start the recording?

12      A.   I said I believe so, yes, ma'am.

13      Q.   And that was after Verdi and Krepps had been putt in

14  respective interview rooms?

15      A.   No, they -- the recordings have to be started first,

16  Ms. Williamson, before they're put in the rooms.

17      Q.   Okay, so the recording started and then they're put

18  in their room?

19      A.   Correct.

20      Q.   On this particular day?

21      A.   Correct.

22      Q.   And after Mr. Homlar arrived and went into the

23  interview room, you just never stopped that recording?

24      A.   No.  The recording was not stopped, no.

25      Q.   So for all intense and purposes, when Mr. Homlar went

1    into the room, he was talking to the client and it was being

2    recorded?

3         A.   Yes.

4         Q.   Same thing for when Ms. McMichael went into the

5    interview room with Mr. Krepps; is that correct?

6         A.   Yes.

7         Q.   Do you know, I guess, once a disk is complete where

8    the recording is done on a disk, who writes what is on the

9    disk?

10        A.   I believe I did.

11        Q.   And you said that the individual at the jail who

12   supposedly talked to Mr. Krepps came to the Sheriff's Office.

13        A.   He reached out to the Sheriff's Office, said that he

14   had some information.  We brought him down, we spoke to him,

15   that was it.  I never knew he even went back and spoke to your

16   client.  We never spoke to him after that.

17        Q.   Going back to writing what is on the disk, do you

18   recall what you wrote on the disk?

19        A.   "Interview with," which is what I normally do,

20   "Interview with" up top, that person's name, a property receipt

21   number on the left side of the disk.  On the right side, the

22   case number.  At the bottom, my name.

23        Q.   Do you recall when Ms. McMichael arrived at the

24   Sheriff's Office?

25        A.   Yes.

1          THE COURT:  You're talking about time?

2          MS. WILLIAMSON:  Yes, Your Honor.

3     A.   No.

4     Q.   (Ms. Williamson) Do you recall speaking to her when

5     she arrived?

6     A.   Yeah.  Even gave her a bottle of water that she was

7     scared to take because she thought I was going to poison it.

8     But, yeah.

9     Q.   Do you recall at that time whether Ms. Paine was also

10    there at the Sheriff's Office?

11    A.   She was.

12    Q.   Do you recall indicating, or do you recall having a

13    conversation with Ms. McMichael as to whether any kind of

14    conversation that she might have with Mr. Krepps was going to

15    be recorded?

16    A.   I'm sorry?

17    Q.   I'll repeat it.  Do you recall having a conversation

18    with Ms. McMichael about whether the conversation she might

19    have with her client in that interview room would be recorded?

20    A.   No, I don't recall.

21    Q.   So, you don't recall indicating that you told Ms.

22    McMichael that it would not be recorded?

23    A.   No.  I would never tell anyone that.

24    Q.   Do you recall telling her that visually it would be

25    recorded, but not audio?

1      A.   I don't remember speaking to her about that either,

2   but I definitely know I didn't tell her it was not recorded.

3      Q.   When Mr. -- I guess in regards to Mr. Krepps, after

4   he asked for an attorney, you did not call Ms. McMichael

5   directly, you contacted Ms. Paine; is that correct?

6      A.   Yes, ma'am.

7      Q.   And from your understanding, Ms. Paine contacted who?

8      A.   The young lady you're speaking of.

9      Q.   Ms. McMichael?

10     A.   Yes.

11          MS. WILLIAMSON:  That's all I have, Your Honor.

12          THE COURT:  I'm sorry, I did that in the wrong order.

13     Anybody else have any other questions for this witness?

14          MS. PAINE:  No.

15          MR. HOMLAR:  I do, Your Honor.

16                        RECROSS-EXAMINATION

17   BY MR. HOMLAR:

18     Q.   So, just so I'm clear, this recording was an

19   intentional act; correct?

20     A.   It was a what, sir?

21     Q.   Intentional?

22     A.   I mean it's a requirement that if you want to call

23   that intentional, yes.

24     Q.   Okay.  But there was -- you know, it wasn't an

25   inadvertent recording?

1    A.   No.

2    Q.   Okay.  Well, I'm just --

3    A.   I got what you're saying.

4    Q.   I'm not being --

5    A.   I know.  No, it was not inadvertent, no, sir.

6    Q.   If you're recording something, but not monitoring it,

7    it's something -- like what's the safety issue that you're

8    recording for?

9    A.   I'm not sure what you're asking.

10   Q.   Well, if it's being recorded and documented and

11   preserved, how is that involved with safety, like you're just

12   going to save someone?

13   A.   I mean if something happens, we have to -- I mean

14   when it's being monitored, of course we have to document it.

15   But that day, we learned nothing from speaking to either

16   person, so it wasn't much to document.

17   Q.   Okay.  Let me -- as far as -- I'm just trying to

18   understand the safety aspect of it.  What good is recording a

19   room for safety purposes?

20   A.   I mean we're not in the room at all times.  Anything

21   could -- like I say, could happen.

22   Q.   But the recording for safety purposes, is it the

23   safety of the defendant?

24   A.   The person that is placed in that room, yes.

25   Q.   So you --

1       A.   But it also could be for you.

2       Q.   All right, you have a historical record of what

3  happened, but you're not -- you couldn't go in there to save

4  someone based on having a recording of what happened; correct?

5       A.   No.

6       Q.   Thank you.

7       THE COURT:  Anything else from anybody else?

8      Anything else from anybody else?

9       MR. HOMLAR:  You Honor --

10      Q.   (Mr. Homlar) Would you consider the interview room a

11  private location?

12      A.   Would I?

13      Q.   Yes.

14      A.   Yeah.

15      Q.   Okay.  And it's fair to say you didn't have my

16  client's consent or my consent in recording; correct?

17       MS. PAINE:  Objection, Your Honor.  I don't know that

18      -- I'd assume that calls for speculation.

19       THE COURT:  Whether or not he asked them for consent?

20       MS. PAINE:  He said whether -- whether he had his

21      consent.

22       THE COURT:  All right, phraseology.

23       MR. HOMLAR:  Okay.

24       THE COURT:  I'll sustain -- okay, I'll sustain that.

25      Rephrase it.

1       Q.   (Mr. Homlar) Did you obtain consent from myself or my

2    client to record this conversation?

3       A.   No.

4            MR. HOMLAR:  All right.  Thank you.

5            THE COURT:  Anything else, Ms. Paine?

6            MS. PAINE:  No, Your Honor.

7            THE COURT:  Anything else, Ms. Williamson?

8            MS. WILLIAMSON:  No.

9            THE COURT:  You can step down, leave, stay; whatever

10       you wish.  Thank you.

11       (Whereupon, the witness is excused and steps down from the

12    witness stand.)

13            THE COURT:  Any other witnesses you wish to call?

14            MR. HOMLAR:  Investigator Ferguson.

15            THE COURT:  Investigator Ferguson, please.  If you

16       don't mind, come up here and have a seat.  Go ahead and

17       have a seat, I'll swear you in after you're seated.

18       (Whereupon, the witness enters the courtroom and takes the

19    witness stand.)

20            THE COURT:  Will you raise your right hand?

21       (Whereupon, the oath is administered to the witness by the

22    Court.)

23            THE COURT:  Please state your name for the record.

24            THE WITNESS:  Investigator Ryan Ferguson.

25            THE COURT:  Are you a R-y-a-n?

1          THE WITNESS:  Yes, sir.

2          THE COURT:  Are you a F-e-r-g-o-n?

3          THE WITNESS:  F-e-r-g-u-s-o-n.

4          THE COURT:  Please answer any questions the parties

5      may have.

6                    INVESTIGATOR RYAN FERGUSON

7                    After Having Been Duly Sworn

8               Was Examined and Testified as Follows:

9                         CROSS-EXAMINATION

10     BY MR. HOMLAR:

11         Q.   Investigator Ferguson, you're employed with Richmond

12     County Sheriff's Office; correct?

13         A.   Yes, sir.

14         Q.   Going back to February 27th of this year, you were

15     working at CID; correct?

16         A.   Correct.

17         Q.   Were you involved in the monitoring of the interview

18     rooms where William Krepps and Vaughn Verdi were being kept?

19         A.   Yes.

20         Q.   Okay.  Can you explain to the Judge how that

21     monitoring process goes?

22         A.   We log in to a program called "Case Cracker," which

23     is a program used to record the interview rooms, and we observe

24     the video on the screen --

25              THE COURT:  Will you get closer to the mike?  I can't

1          hear you very well.  What's the name of the program?

2                    THE WITNESS:   Case Cracker.

3                    THE COURT:  Cracker?

4                    THE WITNESS:  Yes.

5                    THE COURT:  Case Cracker --

6                    THE WITNESS:  Yes, sir.

7                    THE COURT:  -- or Case Tracker?

8                    THE WITNESS:  Cracker.

9                    THE COURT:  Okay. Go ahead.

10         A.   We can remote access into that from our desk tops and

11    I'll observe the interview from there.

12         Q.   (Mr. Homlar) Okay.  What instructions, if any, were

13    you given regarding monitoring of these attorney-client

14    conversations?

15         A.   We have to visually monitor all arrestees inside of

16    our interview rooms.  We -- we do not listen to the audio.

17         Q.   Okay.  When an attorney was present in the room --

18    well, let me ask you this.  Who instructed you to -- on how to

19    monitor the rooms when the attorney was present?

20         A.   It's part of our policy.

21         Q.   Okay.

22         A.   Our policy is that all arrestees inside the interview

23    rooms have to be monitored, visually monitored.

24         Q.   Okay.  What is your understanding of the policy

25    regarding recording?

1       A.   In order to visually monitor, the computer has to be

2  turned on, so.  Unless -- unless we're sitting in the room with

3  you, I mean, in order to visually monitor the room, it has to

4  be activated.

5       Q.   So it has to be recording to be monitoring?

6       A.   Correct.

7       Q.   Okay, that's specify to this Case Cracker?

8       A.   To the program.

9       Q.   Who provided you direction as far as turning volume

10  down, video down, or whatever, when an attorney is in the room?

11      A.   Direction as to our policy, or direction to someone

12  walk through, just checking?

13      Q.   On that date, were you provided any guidance about

14  how to deal with this, or what to do?

15      A.   Captain Young came through and verified everyone had

16  their audio off.

17      Q.   Do you recall you and I sitting -- it was at your

18  desk?

19      A.   Correct.

20      Q.   Okay.  And we had a fairly informal conversation; is

21  that correct?

22      A.   That's correct.

23      Q.   We're both kind of from other areas and why Walmart

24  and sweet tea and stuff?

25      A.   Correct.

1      Q.    Do you recall at one point turning the video up in my

2  client's -- when my client was alone and he was sprawled out on

3  the metal desk?

4      A.    I mean I turned the volume up and down periodically,

5  depending on whether I can hear it or not.

6      Q.    Let me ask you about the video.  Do you recall

7  turning the video on and seeing my client sprawled out on the

8  desk?

9      A.    Yes.

10      Q.    Do you remember me saying something to the effect of,

11  "Does that guy look like he's worried or concerned about

12  anything?"

13      A.    I -- I don't remember that part of it.  It was a very

14  informal conversation.  It wasn't --

15      Q.    Yes.

16      A.    It wasn't something I recorded or wrote down.

17      Q.    Okay.  Did you do a report based on the -- that day,

18  what you observed that day?

19      A.    No.

20      Q.    Was anyone else, to your knowledge, monitoring the

21  conversation?

22      A.    Not to my knowledge.

23      Q.    And were we sitting at your desk, or was that a work

24  station, or --

25      A.    That's my desk.

1      Q.    And it's in proximity to the interview room such that

2    you could hear a door opening or closing; is that fair to say?

3      A.    Yeah.  And depending on how loud it's closed.  I mean

4    you don't necessarily always hear it open, but if someone slams

5    the door, you absolutely hear it.

6      Q.    And when someone -- when myself, or when Cawanna, the

7    other defense attorney, would leave out of the room, you would

8    turn up the volume and turn on the video; correct?

9      A.    Excuse me?

10     Q.    Okay, when the attorney for Mr. Krepps was in that

11   room, you weren't visually monitoring it on the screen or

12   auditorily monitoring it; correct?

13     A.    That's correct, I was not.

14     Q.    But when she left the room, you would turn the sound

15   up and the audio up; correct?

16     A.    Yes, I would.

17     Q.    And as I recall, there was -- well, do you recall

18   seeing Mr. Krepps doing, like, dips on a chair?

19     A.    Yes.

20     Q.    Do you recall seeing him doing push-ups on the

21   ground?

22     A.    He was exercising in the interview room, yes.

23     Q.    Do you recall a conversation between you and I where

24   I said -- we talked about how disgusting that floor was and how

25   many people had puked and blood was on that floor?

1          A.    Yes.

2          Q.    Are you aware of a standard practice, standard

3     operating procedure with Richmond County Sheriff's Office, the

4     Criminal Investigative Division that requires that any time

5     someone is present in that room that the room be recorded for

6     safety purposes?

7          A.    Any time an arrestee is inside the interview room,

8     the video would be activated.  It has to be visually -- the

9     person has to be visually monitored.

10         Q.    And so it's your testimony that in order to visually

11    monitor it, it has to be recorded?

12         A.    Unless we're standing inside, then I'm not familiar

13    with another way of doing that.

14         Q.    And it's your understanding that the recording system

15    is mandatory anytime someone's in the room?

16         A.    Any time an arrestee is in the room, he has to be

17    visually monitored at all times.

18         Q.    Does the SOP indicate how many people have to

19    monitor?

20         A.    It does.  I'd have to consult with -- it has to be

21    monitored -- from my understanding; now, I may be wrong or

22    incorrect, but at least two -- two investigators.

23         Q.    Who other than you was monitoring the room?

24         A.    I would assume the other investigator that was

25    assigned the case, on the other side, when he was not in the

1    interview room, was also monitoring it, but when he's in the

2    room, so he's already in there, so there's one person visually

3    monitoring the person in the room because he's physically

4    there.

5        Q.   I'm talking about on this occasion.  Are there

6    supposed to be two people monitoring the room for safety

7    recording.  Who was the other person monitoring with RCSO?

8        A.   My assumption is Investigator Grant had that set up.

9    It's not my case.  I -- I just was monitoring from my desk.

10       Q.   And he could be sitting in his office monitoring?

11       A.   Absolutely, or he could have been sitting in the

12   interview room.

13       Q.   Okay.  Could he have been standing at the front desk

14   while these interviews were going on?

15       A.   He could have been -- I don't know where Investigator

16   Grant was standing unless he was in the interview room when I

17   was watching.

18       Q.   Thank you.

19            MR. HOMLAR:  I don't have any other questions.

20            THE COURT:  I realize I did this wrong.  Questions

21       for this witness?

22            MS. WILLIAMSON:  Yes.

23                          CROSS-EXAMINATION

24   BY MS. WILLIAMSON:

25       Q.   Investigator Ferguson, are you able to tell, I guess

1    on that computer program, who has remote access at any given

2    time?

3         A.   No.

4         Q.   It doesn't keep a record of that?

5         A.   Not at my desk.  I'm not familiar with the actual

6    program, itself.  I didn't have it installed.

7         Q.   How many people could potentially have access?

8         A.   I do not know.

9         Q.   Could every investigator have access?

10        A.   Not to my knowledge.

11        Q.   Is that program on each investigator's computer?

12        A.   The program is a remote access.

13        Q.   You said that you use -- what is it?  Case Cracker;

14   is that correct?

15        A.   Correct.

16        Q.   To have remote access from your computer?

17        A.   That's the program that records it.  The company that

18   installed the cameras.

19        Q.   And that also gives you remote access to monitor the

20   interview rooms?

21        A.   Yes.

22        Q.   At your desk?

23        A.   Correct.

24        Q.   Does every investigator have that ability on their

25   computer?

1       A.   Yes.  But that does not necessarily mean that there's

2    a limit.  I don't know if there's a limit as to how many people

3    can be logged in at the same time.

4       Q.  And there's no way on the actual computer program to

5    tell who has access at any given time?

6       A.  I couldn't tell you that.  I didn't develop the

7    software.

8       Q.  I understand.  But just in you using it every day?

9       A.  I don't deal with that part of it, so I don't -- I

10    mean I don't go back and check and see who was watching, so I

11    don't understand what -- I've told you I don't know how that

12    software works pertaining to that, so I don't understand what

13    you're asking.  I've answered.

14          THE COURT:  Can I try?

15          THE WITNESS:  Sure.

16          THE COURT:  Based upon your experience, not your

17       computer science knowledge; okay?  Based upon what you see

18       when you use the program on a regular basis, do you have

19       any way of knowing if another computer is monitoring while

20       you're monitoring?

21          THE WITNESS:  No, sir.

22          THE COURT:  That doesn't show up as the number of

23       people logged into this room as seven, or three, or --

24          THE WITNESS:  No, sir.

25          THE COURT:  Anything else, Ms. Williamson?

1           MS. WILLIAMSON:  Yes, Your Honor.

2       Q.   (Ms. Williamson) You said that Captain Young, was it,

3   went around and told everyone to turn their audio off?

4       A.   He walked through to make sure that the audio was off

5   when the attorney and the client were alone in the room, but he

6   still has to be visually monitored.  He just double-checked to

7   make sure it was off, to make sure everyone was following the

8   procedure.

9       Q.   And do attorney-client conversations normally occur

10  there?

11      A.   It's a rare occurrence.

12          MS. WILLIAMSON:  That's all I have, Your Honor.

13          THE COURT:  Questions, Madam District Attorney?

14          MS. PAINE:  Yes.

15                      DIRECT EXAMINATION

16  BY MS. PAINE:

17      Q.   So, Investigator Ferguson, am I correct that the

18  reason -- the reason that you were muting it and, I guess,

19  visually turning off the monitor was because you were aware

20  that there was an attorney in the room; correct?

21      A.   Correct.

22      Q.   All right.  And that was while you were -- Mr. Homlar

23  was seated at your desk and otherwise every time an attorney

24  would go in the room, you would do that?

25      A.   Absolutely.

1    Q.   And, to your knowledge, did yourself or anyone else

2    in the CID, to your knowledge, observe that CD after the

3    recording was completed?

4    A.   No.

5    Q.   And is it standard procedure that the recording

6    starts before the person enters the room and ends after the

7    person is removed?

8    A.   That's correct.

9    Q.   How frequently would you say it is that defense

10   attorneys go in those rooms, the interview rooms?

11   A.   Since I've been in the CID for the last four years, I

12   maybe recall five or six.

13   Q.   Five or six times in five years?

14   A.   Yes.

15   Q.   Or?

16   A.   Four years.

17   Q.   Okay.  And I guess at that point in time, did Mr.

18   Homlar ever ask you specifically whether or not the interview

19   rooms were recorded, or were going to not be recorded when he

20   went in there?

21   A.   No.

22   Q.   Thank you.

23        THE COURT:  Anything else for this witness?

24        MR. HOMLAR:  No, sir.

25        MS. WILLIAMSON:  No, Your Honor.

1          THE COURT:  You can step down, stay here, go home,

2     whatever you wish.

3          THE WITNESS:  Yes, sir.

4     (Whereupon, the witness is excused and steps down from the

5     witness stand.)

6          THE COURT:  Do you have any other evidence you wish

7     to present, Mr. Homlar?

8          MR. HOMLAR:  I do not, Your Honor.

9          THE COURT:  Ms. Williamson, I'm turning to you.  Do

10    you have any other evidence you wish to present?

11         MS. WILLIAMSON:  Yes, Your Honor, I would like to

12    call Ms. Cawanna McMichael to the stand.

13         THE COURT:  Cawanna McMichael, please.  If you would,

14    come on up and have a seat.  You know I'll swear you in

15    once you're seated.

16         MS. MCMICHAEL:  Okay.

17    (Whereupon, the witness enters the courtroom and takes the

18    witness stand.)

19         THE COURT:  Would you please raise your right hand?

20    (Whereupon, the witness is administered the oath by the

21    Court.)

22         THE COURT:  You may put your hand down.  Please state

23    your name for the record.

24         THE WITNESS:  Cawanna McMichael.

25         THE COURT:  We don't need you to spell it, we're

1    familiar.  You can go ahead.

2                      CAWANNA McMICHAEL,

3                   After Having Been Duly Sworn,

4              Was Examined and Testified as Follows:

5                        DIRECT EXAMINATION

6    BY MS. WILLIAMSON:

7        Q.   Ms. McMichael, back in February of this year, who

8    were you employed with?

9        A.   The Public Defender in Augusta.

10       Q.   And were you, I guess, Mr. William Krepps' attorney

11   at the time?

12       A.   Yes, I was.

13       Q.   Back in February of this year, in particular -- as

14   I'm sure you're familiar with why we're here.  Could you just

15   begin what brought you into this current event?

16       A.   Yes, I was -- had just gotten to work and I received

17   a call from you, Ms. Williamson, stating that Mr. Homlar had

18   informed her that my client was going to be taken to CID to get

19   a -- to give a statement.  At that time, I called his mother

20   and asked -- and she -- I asked her what was going on and she

21   informed me that Mr. Krepps needed to see me.  So I left the

22   office right away, went to CBW and I did an attorney visit with

23   Mr. Krepps.

24       Q.   Let me interrupt you.  You said CBW.  That's the

25   local jail here in Richmond County?

1      A.   That is correct.

2      Q.   And so you went to the jail to go speak to him?

3      A.   Yes, I did.

4      Q.   How long were you there, would you say?

5      A.   I guess about 30 minutes.  I would say about 30

6  minutes.  We had a visit and I left.

7      Q.   And then, after you left the jail, what happened?

8      A.   On my way back to the Public Defender's Office, I

9  received a call from Ms. Paine and she was informing me that my

10  client was going to give a statement at CID.  At that time, I

11  told her that I had just left from speaking with my client and

12  that he would not be giving a statement at CID, and he did not

13  need to be transported.  And she informed me that she would

14  just get back to me.

15      Q.   And then you came back to the office, to the Public

16  Defender's Office?

17      A.   I went back to the Public Defender's Office and at

18  that time, I started taking client meetings.  While I was in

19  client meetings, I received a message from our front desk

20  stating that Ms. Paine had contacted the office and that Mr.

21  Krepps was at CID.

22      Q.   Okay, so you then -- did you go to CID?

23      A.   Yes.  At that time, I -- so after I got the message,

24  I ended my client appointment and I went straight over to CID.

25      Q.   When you arrived, who do you recall seeing?

1          A.   I had to stand out and wait, I believe Ms. Paine came

2     and got me, but I saw Investigator Grant and there was another

3     officer there.  I don't remember who it was.  Well, I just

4     didn't know who he was.  I just knew Investigator Grant because

5     I'm familiar with his face.

6          Q.   And Ms. Paine was there?

7          A.   She was there.

8          Q.   And you obviously asked to speak to Mr. Krepps.  Did

9     you see him?

10         A.   Yes.  I asked to see -- well, everybody knew I was

11    there to see Mr. Krepps.  I actually went to the restroom and

12    gathered my thoughts because I was kind of scared.  And then

13    when I came out, Investigator Grant was out in the hall and

14    there was another officer in the hall, and before I went in, I

15    asked if it -- you know, if anything was going to be recorded

16    and Investigator Grant said no and he motioned for them to cut

17    the -- he said, "Cut the audio."

18         Q.   Do you know who he motioned to by any chance?

19         A.   No, I don't.

20         Q.   Did you see the person that he motioned to?

21         A.   I don't know if he was motioning to the other guy, or

22    if it was some sort of -- I don't know.  I just remember him

23    motioning to cut the audio, and I was fine with that.

24         Q.   Did -- just to be specific, did he indicate whether

25    it was going to be visually monitored?

1          A.   He did not indicate that.  I guess I assumed that

2     because he said the audio, but I don't -- I assumed that maybe

3     they would keep the visual for safety, or to ensure that I was

4     safe.

5          Q.   You just assumed that they would keep the visual?

6          A.   Yes.  Because he said audio.

7          Q.   Okay.  And so from your impression when you entered

8     the interview room with Krepps, it was not being

9     audio-recorded?

10          A.   That's correct.

11          Q.   Did you have a conversation with Ms. Paine before you

12     entered the interview room?

13          A.   No.  Actually, when I came out of the bathroom, she

14     wasn't in the hall.

15          Q.   Okay.  But she was there, I guess, when you initially

16     arrived?

17          A.   Yes.

18          Q.   Okay.  When you -- so you went into the interview

19     room, you had a conversation with Mr. Krepps.

20          A.   Yes.

21          Q.   Beyond whatever conversation you had with Mr. Krepps,

22     was there anything notable that occurred while you were in that

23     interview room?

24          A.   Ms. Paine came in the interview room while me and Mr.

25     Krepps were talking.  And I think she indicated she had

1     somewhere to go and whether or not he was going to make a

2     statement.  We had a conversation about that.  I think I asked

3     her about whether or not there was a plea offer because he

4     wanted to know that.  She indicated whatever the plea offer, I

5     really don't remember what it was.  I think it was something

6     like life.  And she left.

7          Q.   Okay.  After she left, you continued to have a

8     conversation with Mr. Krepps?

9          A.   Yes, I believe that Investigator Grant had to come in

10    and hear Mr. Krepps say he did not want to give a statement.

11         Q.   And you were there when Mr. Grant went back in to

12    talk to Mr. Krepps?

13         A.   I was in there when he said that -- when he asked --

14         Q.   Krepps?

15         A.   Krepps, William if he wanted to give a statement and

16    William said no.

17         Q.   And then you and Mr. Grant -- Investigator Grant left

18    the interview room?

19         A.   I left.

20         Q.   Did you hang around the Sheriff's Office or CID after

21    that, or did you just immediately leave?

22         A.   I left and went back to work.

23         Q.   Okay.  You left the Public Defender's Office in July

24    of this year?

25         A.   That's correct.

1          Q.   At that point in time, you had only received paper
2     discovery in this case?
3          A.   Yes.  And I was in the process --
4          Q.   You had not received any disks for audio-visual
5     discovery?
6          A.   No, I had -- the investigators were copying the disks
7     at the time.
8          Q.   But you had not received any disks?  Not that you can
9     recall?
10         A.   No, not that I -- I don't recall receiving any disks.
11         Q.   Okay.  I believe that's all I have.
12              THE COURT:  Mr. Homlar, any questions?
13                        DIRECT EXAMINATION
14    BY MR. HOMLAR:
15         Q.   Do you recall what time you arrived on the 27th?
16         A.   To the CID?
17         Q.   Yes.
18         A.   No, it would have been somewhere between 10 and 11
19    because I was in client meetings and I took client meetings at
20    10.
21         Q.   Could it have been as late as, like, 12 or 12:45?
22         A.   What do you mean?
23         Q.   Well, I mean, when you got to CID?
24         A.   I think it would have been between 10, or between 10
25    and 12.

1        Q.   Was I there first?

2        A.   I never saw you.

3        Q.   Okay.

4        A.   I don't think I saw you at CID.

5        Q.   Okay.  What time did you get down to the jail, do you

6    recall?

7        A.   Yeah, it was about 8:30, somewhere in there.

8        Q.   And what prompted you to go to the jail?

9        A.   Kelly's call combined with me contacting Mr. Krepps'

10   mother and her saying that he needed to speak to me because she

11   was trying to call me at the same time I was trying to call

12   her.

13       Q.   All right.  Thank you.  I don't have any other

14   questions.

15            THE COURT:  I'm sorry, let me make sure I -- I got

16       locked up there.  You went to the jail at about what time?

17            THE WITNESS:  Around 8:30; between 8:30 and 9:00.

18            THE COURT:  And you were at CID between 10 and 12?

19            THE WITNESS:  Yes, sir.

20            THE COURT:  And you never saw Mr. Homlar?

21            THE WITNESS:  I don't remember seeing him, no.

22            THE COURT:  Okay.  Do you have any questions from the

23       State?

24                          CROSS-EXAMINATION

25   BY MS. PAINE:

1    Q.   Ms. McMichael, wasn't it your client that wanted

2    initially to speak to investigators, but just wanted to consult

3    with you first?

4    A.   I -- I don't know how that transpired, how he came to

5    be at CID.

6    Q.   Okay, so -- I mean I guess at that point, you were

7    under the impression that he was brought involuntarily?

8    A.   I was under the impression that after I spoke with

9    him he did not want to go to CID.  How it is that he was

10   initially supposed to go to CID, I don't know.

11   Q.   Okay.  And what time did you say that you spoke with

12   him at the jail?

13   A.   Around 8:30.

14   Q.   Okay, what prompted you to go, I guess, at 8:30?

15   A.   Because I received a phone call from Kelly stating

16   that Mr. Homlar had notified her that he was going to be

17   brought to CID.  I was confused as to why.  I contacted his

18   mother because that's who I usually talk to, and she said, "I

19   was trying to get in touch with you.  William wants to talk to

20   you."  So because he was -- they were saying he was going to

21   CID, of course, I went to see the client, see what was going

22   on.

23   Q.   And so you went to the jail at 8:30?

24   A.   Yes.

25   Q.   Okay.  Thank you.  I don't have any questions.

1          THE COURT:  Anything else?

2                    REDIRECT EXAMINATION

3    BY MS. WILLIAMSON:

4          Q.   And after you left the jail, you spoke to Ms. Paine?

5          A.   Yes.

6          Q.   She called you, or you called her?

7          A.   She called me.

8          Q.   And, again, that conversation consisted of her --

9          A.   She said that she was going -- that William wanted to

10   come to CID.  I told her that I left the jail.  She seemed kind

11   of surprised by that and then, at that point, I just said, "He

12   doesn't want to give a statement.  I just left the jail."  And

13   she said she would get back to me.

14         Q.   Did you ever tell her, you know, that she did not

15   need to bring over, or not bring him over?

16         A.   Yes.

17              MS. WILLIAMSON:  That's all.

18              THE COURT:  Anything else?  Anything else?

19              MR. HOMLAR:  No.

20              MS. PAINE:  No, sir.

21              THE COURT:  Ma'am, you can step down, stay here, or

22         go home, as you wish. Thank you.

23              THE WITNESS:  Thank you.

24         (Whereupon, the witness is excused and steps down from the

25   witness stand.)

1          THE COURT:  Ms. Williamson, do you have any

2     additional evidence you wish to present?

3          MS. WILLIAMSON:  No, Your Honor.

4          THE COURT:  You don't know anything about this to

5     testify, do you?

6          MS. WILLIAMSON:  As already indicated, the only -- I

7     guess the only thing I think I had involvement with was I

8     got a call from Mr. Homlar on this particular day.  My

9     understanding is that he did not have Ms. McMichael's

10    phone number, so he called me because he had my phone

11    number, to let me know that Mr. Krepps was going to be

12    brought to CID.  So, therefore, I notified Ms. McMichael,

13    who was the attorney of record, to go down there and make

14    sure of what was going on.

15         THE COURT:  Do you know what time that was?

16         MS. WILLIAMSON:  It was early in the morning, Your

17    Honor.  I had literally just arrived at the office and I

18    usually arrive at the office between 8:30 and 9:00, very

19    regularly.

20         THE COURT:  Do you need to ask her anything about

21    that?

22         MR. HOMLAR:  I do not, Your Honor.

23         THE COURT:  Do you need to ask her anything about

24    that?

25         MS. PAINE:  No.

1        THE COURT:  Do you have any other evidence you wish

2     to present?

3        MS. WILLIAMSON:  That is all my evidence, Your Honor.

4        THE COURT:  Does the State wish to present any

5     evidence?

6        MS. PAINE:  Can I have just one second.

7        THE COURT:  Uh-huh.

8        MS. PAINE:  Your Honor, I think it would be prudent

9     at this point for me to testify to some degree.

10        THE COURT:  You want to come up here, bring anything

11     you need?  Go ahead and sit down and I'll swear you in.

12     (Whereupon, the witness takes the witness stand.)

13        THE COURT:  Please raise your right hand.

14     (Whereupon, the witness is administered the oath by the

15     Court.)

16        THE COURT:  You may put your hand down.  Tell me your

17     name.

18        THE WITNESS:  Natalie Paine.

19        THE COURT:  And at this point in time, you are the

20     elected District Attorney for the Augusta Judicial

21     Circuit; true?

22        THE WITNESS:  Correct.

23        THE COURT:  Do you care if I sort of lead a little

24     bit?

25        THE WITNESS:  That's fine with me.

1          THE COURT:  Is that okay with the Defense lawyers?

2          MR. HOMLAR:  Yes.

3          THE COURT:  Is that okay?

4          MS. WILLIAMSON:  That's fine.

5                         NATALIE S. PAINE,

6                 After Having Been Duly Sworn,

7             Was Examined and Testified as Follows:

8                         EXAMINATION

9    BY THE COURT:

10        Q.   How did this incident -- and when I say this

11   incident, I guess the thing that triggered it, assuming that

12   it's true, was the finding of the maps.  How did that come to

13   your attention?

14        A.   Investigator Grant called me.

15        Q.   Would have that been the night of the 26th or the

16   morning of the 27th, assuming those are the correct dates?

17        A.   I want to say it was the morning, but I don't

18   remember if it was the morning or the evening.  I mean I talked

19   to Investigator Grant probably daily, so I don't remember.  It

20   doesn't stick out with me.

21        Q.   And whose idea was it to transport the Defendants to

22   -- I guess to -- what else did you know?  Let me ask that.

23   What else -- what did you know as a result of that phone call?

24        A.   The only thing that I recall was that the Defendants,

25   Mr. Krepps and Mr. Verdi, wanted to address something with the

1    Sheriff's Office and -- but they wanted to speak to their

2    attorneys first.  And so the role that I played was that

3    Investigator Grant had called me about contacting their

4    attorneys in order to get their attorneys to come to CID.  But

5    I had no knowledge about -- I mean, at the time when the jail

6    was being -- when the shakedown was done at the jail, that was

7    not done -- I mean that was done as a result of contraband

8    coming into the jail, so that was like a random search at the

9    time.

10           And then collateral to that, obviously we had an

11   interest in trying to locate Preston's body.  So when they

12   located the maps -- well, and also, from a trial strategy

13   point, as well, you know, giving them an opportunity to state

14   on the record one way or the other whether or not they were

15   going to make a statement because obviously, as Your Honor is

16   well aware, as sure as we hadn't, then it would have been --

17   you know, that could become an issue at trial.

18       Q.   So did you reach out to the lawyers fairly promptly

19   as far as you can recall?

20       A.   Yes.

21       Q.   Tell me, if the phone records show whatever the time

22   was, was that -- is that probably correct?

23       A.   Yes.  Yeah, that's what I have in my phone.

24       Q.   And that would have been about what time?

25       A.   8:45ish in the morning.

1   Q. Okay.  And you would have called Mr. Homlar first

2 because you had his number in your phone probably?

3   A. Yes, and from my recollection, the maps were found in

4 Mr. Verdi's room.  But I actually believe that it was Mr.

5 Krepps that wanted to initially make a statement.

6   Q. Okay.  But whatever that whole conversation was was

7 coming through Investigator Grant, not through lawyers, not

8 through Defendants, it was -- you -- it was being filtered to

9 you through Investigator Grant?

10   A. Right.

11   Q. How did it -- did you have Ms. McMichael's number, or

12 did you --

13   A. I think I had to call the Public Defender's Office.

14 I don't know that I had her number.

15   Q. Do you recall your conversation with Mr. Homlar,

16 roughly?

17   A. I just remember I asked him to come to CID.

18   Q. Did he say anything today about that phone call that

19 you disagree with?

20   A. To be honest with you, I don't -- other than him

21 saying that he was on the way, I don't remember what else he

22 said.

23   Q. When Ms. McMichael described her conversation with

24 you as she, by her version, was leaving the jail and headed to

25 her office, do you disagree with anything she said?

1      A.   I mean I don't remember that specifically, that

2    conversation.  I remember -- I do remember discussing with

3    Investigator Grant something to the effect of saying whatever

4    it was the conversation was that Ms. McMichael and I had on the

5    phone that I felt pretty confident that by the time -- that Mr.

6    Krepps was not going to be making a statement.  But even though

7    that was the -- that was the case, he would have still been --

8    you know, we don't ever accept that from an attorney, we would

9    get that from the Defendant.

10     Q.   Okay.  I do not know what time everybody arrived.

11   Were you there when they arrived, or were they there when you

12   arrived?

13     A.   I believe Mr. Homlar was there when I arrived because

14   I remember seeing him at Mr. -- or Investigator Ferguson's desk

15   and not -- I just remember that sticking out in my mind.

16     Q.   Okay.  And when we're talking about arriving, we're

17   talking about arriving at CID?

18     A.   Yes.

19     Q.   Just for people who may not -- who may need to read

20   this record for whatever reason later, CID, to your office, is

21   eight blocks down Walton Way?

22     A.   Yes.

23     Q.   If I'm wrong, it's off by one.

24     A.   But I don't remember where I --

25     Q.   Did you have a conversation with Homlar?

1        A.   That morning, or --

2        Q.   Right then.

3        A.   -- on the phone, or --

4        Q.   Right when you come in, do you think you had a

5   conversation with him?

6        A.   I know I spoke to him while he was in CID multiple

7   times.

8        Q.   So he would go in the office, go in the room and talk

9   to the client, come out and talk to you, go in the room and

10   talk to client, or do you know?

11        A.   I don't remember.  I just remember --

12        Q.   Okay.  You remember talking to him several times?

13        A.   I mean, to be honest with you, I remember losing

14   interest very quickly because it was apparent to me that we

15   weren't going to be finding Preston's body.

16        Q.   Okay.  At any time did you have a conversation with

17   Mr. Homlar about recording, not recording, monitoring, not

18   monitoring --

19        A.   No.

20        Q.   -- the system?

21        A.   Never talked to me about it.  Nor did Ms. McMichael.

22   Which I also found to be odd because he had requested on

23   multiple occasions things to be in writing.

24        Q.   Who was that?

25        A.   Mr. Homlar.  So when I got the motion, obviously,

1    that he filed in this matter, I -- I was surprised because he

2    never talked to me about that and I felt like that was

3    calculated.

4        Q.   So he did not speak with you and you did not speak

5    with McMichael -- I mean none of the -- you and the other

6    lawyers discussed recording, not recording, monitoring, not

7    monitoring?

8        A.   We -- they did not inquire of me anything about

9    whether or not the room was recorded or not recorded and I was

10   available to both of them in CID during this timeframe.

11       Q.   Okay.  Are you aware of anybody else having any

12   conversations with the lawyers about those issues?

13       A.   No, I just --

14       Q.   The recording and whatnot?

15       A.   When I got the motion about this, I did inquire.  It

16   was a surprise to me, first and foremost, because I obviously

17   had not watched any of the CDs at this point, being that it was

18   so early.  But I remember talking with Investigator Ferguson

19   and Investigator Grant and both of them acknowledged that they

20   had not viewed the CD and that it was recorded, but not

21   monitored.

22       Q.   All right, so that begs this question to somebody who

23   did not work in at least this generation of the D.A.'s Office.

24   How do you send out discovery, because that's how it came out,

25   if you don't look at it?  Is it only because you copy whatever

1    is on the disk --

2    A.   Yes.

3    Q.   -- goes to a copy disk?

4    A.   Yeah, we have a -- we have a apparatus that you stick

5    the CD, a blank CD and the -- you know, whatever, the copy from

6    the Sheriff's Office in and you literally can print multiple

7    copies at the same time.  But, I mean, you don't have to open

8    it on a computer, you do it on a -- it's like a tower.  It

9    almost looks like a hard drive.

10    Q.   And kind of a CD burner tower thing that it can make

11    a copy from an original onto a blank or --

12    A.   Right.

13    Q.   -- multiple blanks without having ever to -- without

14    having to visually see it?

15    A.   Right.  And it would be -- I mean it would be

16    literally impossible for us -- and by "us," I mean my office,

17    the District Attorney's Office, to comply with discovery on a

18    timely basis if we were to sit there and watch every CD before

19    we sent it out.  In fact, in this case, there were 107 CDs, and

20    given the magnitude of the case, I -- I actually did these

21    myself to make sure that every property receipt number, the CD

22    that corresponded to the property receipt number went out, and

23    I -- I think I numbered all the disks to some degree so that I

24    knew exactly how many CDs went out so that I -- because

25    whenever you're dealing with a large volume of CDs like that,

1    things tend to get confusing.  Just to make sure that they had

2    everything they needed.

3         Q.   Was there ever a situation where you would have made

4    sure what is alleged to be on the Sheriff's Department version;

5    you know, the one you get from the Sheriff's Department, that

6    you would have said, "Yep, that looks like the surveillance

7    video," --

8         A.   No.

9         Q.   "Yep, that looks like an interview with Joe Smith,"

10   or --

11        A.   We do it by property receipt number, so as long as I

12   -- I'm not -- literally, in fact, in this situation, I

13   distinctly -- because it cluttered up my office for a while, I

14   laid out every single property receipt and put every single CD

15   on top of every property receipt and without even -- I mean

16   there's so many property receipts in this case, I mean I was

17   only concerned with making sure that if property receipt one,

18   two, three, four, five, six had two CDs that I had two CDs on

19   that property receipt.

20        Q.   Would you have sent a copy of Verdi's state--

21   whatever you want to call that, his interaction with his lawyer

22   to Krepps and/or Stephens, and vice versa?

23        A.   I did not know that they existed in that capacity.  I

24   did not know.  But if I had known, obviously, I would not have

25   -- I would have -- well, I probably would have brought it to

1     the Court's attention to some degree, but at any rate, I

2     literally copied what I had.

3          Q.   You sent it to everybody?

4          A.   And sent it to everybody.

5          Q.   So everybody has a copy of everybody's statement?

6          A.   To my -- I -- to my knowledge.  Now, there was a

7     period of time, and I don't remember at what point we started

8     doing this, I don't remember if it was before or after the CDs

9     were copied, I know for a fact that I did Mr. Homlar's and then

10    I think the main copy of the CDs, we left up front for the

11    Public -- we had the Public Defenders to come copy, themselves.

12         Q.   Okay.

13         A.   But we make them available for them to come copy. We

14    have a tower room set up in the front lobby of the District

15    Attorney's Office and they can check the CDs out at the front

16    desk and copy them, themselves.  So I -- but to the extent that

17    it was not until this motion was filed, I didn't know what even

18    Mr. Homlar was talking about at the time.  I had no idea that

19    this had occurred, so -- in fact, it was my chief investigator

20    that figured that out because apparently the Public Defender's

21    Office came back to our office and requested a redacted copy

22    and my chief investigator did not know what they were talking

23    about until she plugged it in to her computer and that was when

24    she immediately notified my chief assistant.  And that was the

25    first I heard about it.

1       Q.   Run that back for me, I don't understand.  Redacted

2    copy of what?

3       A.   Exact-- that's what she was questioning.  They showed

4    up at the office with some CDs, asking that they get the

5    redacted copy.  Apparently what they were referring to at the

6    time was that they wanted the redacted -- they wanted us to

7    remove the attorney-client portions of, I assume, the other

8    defendant's statements.  Because basically the way that it's

9    set up at the Sheriff's Office, once you start recording, if

10   you stop the recording, it's going to spit the disk out and

11   then you're going to have multiple disks for one interview.

12   And obviously that -- you know, when playing that in front of a

13   jury, there's -- I mean it's kind of six and one half dozen of

14   the other, but they're -- it's kind of an insinuation that,

15   like, "Oh, well, what happened in those gap periods?"  So we've

16   always preferred it to be one fluid continuous recording.  So

17   --

18       Q.   Okay.  Now, did the P.D. come and talk to you?  When

19   you said "she," are you talking about the P.D., herself, or

20   you're talking about Ms. Williamson?  Or do you know?  Asking

21   for a redacted copies?

22       A.   I have no idea who it was.

23       Q.   Before Mr. Homlar filed his motion?  Because his was

24   filed first.

25       A.   Yes, but I did not find out about it until I got Mr.

1    Homlar's motion and I started making an inquiry from -- I

2    normally go to my chief investigator to ask about the

3    documentary evidence from the Sheriff's Office and she was,

4    like, "Well, that is why, I guess, they came the other day

5    asking for the redacted copy."

6        Q.   Okay.  Is it your belief that no one has seen these

7    videos other than potentially whoever may have received them in

8    discovery?

9        A.   Correct, to include myself, anyone in my office, or

10   anyone at the Sheriff's Office.  In fact, I made sure of that,

11   myself.  I inquired of anyone and everyone that would have had

12   contact with this case at the time and everyone was, like --

13   you know, nobody had watched it.  And that's -- that's very

14   routine in these situations.  I mean for recordings of -- I

15   mean nobody would really be listening or trying to watch

16   interviews until closer to an actual trial date just simply for

17   the sheer volume of cases that we deal with on a daily basis.

18       Q.   Is there anything else you feel like you need to talk

19   about or tell me that I haven't thought to ask you about?

20       A.   No.

21           THE COURT:  Do you have any questions, Mr. Homlar?

22           MR. HOMLAR:  Briefly.  Looking at Defense Exhibit 8

23       and Defense Exhibit 9.

24                        CROSS-EXAMINATION

25   BY MR. HOMLAR:

1      Q.   Defense Exhibit 8 is a photocopy of the front of the

2  CDs that you provided through discovery to me; is that correct?

3      A.   Yes.

4      Q.   Whose handwriting is that on there?

5      A.   I have no idea.  I assume it's mine.  It kind of

6  looks like mine, but I don't know.

7      Q.   Okay, you just testified that you had personally made

8  the copies; correct?

9      A.   Yeah.  But I don't know if this is your copy.  I mean

10  I haven't seen your copy.  I don't remember what my -- I don't

11  even remember what my copies look like, so I don't know if you

12  wrote that on there, or if someone else wrote that on there.  I

13  mean it looks like -- this one looks like my handwriting'ish, I

14  don't know.

15          THE COURT:  When you say "this," right?  Left?  Top?

16      Bottom?

17          THE WITNESS:  Right, the right.  The one on the

18      right.  It says "Verdi, Number 1."  I mean this says

19      "Number 2."  I assume -- I mean I assume that this is

20      mine, I have no idea.

21      Q.   (Mr. Homlar) Okay, you just testified that you're the

22  one who made the copies; right?

23      A.   Yes.  But I don't know if these are the copies that I

24  made for you.

25      Q.   Okay.  Well, I think -- well, I they've already been

1    admitted as such.

2         A.   Your photograph has been admitted as evidence, but I

3    didn't testify to the authenticity of it.

4         Q.   Okay.  Looking at Defense Exhibit Number 9, second

5    page, paragraph three, there's a representation that the

6    interview rooms are continuous recorded, about halfway down,

7    and then there's a representation at the end of that paragraph

8    that this conversation was inadvertently recorded.  Are those

9    two statements inconsistent?

10        A.   I mean I think you're talking about semantics.   I

11   think you know exactly what I meant when I wrote that in that

12   motion.

13        Q.   Okay.

14             THE COURT:  Just do me a favor and answer the

15   question.  Okay?

16        A.   I -- I don't know.

17        Q.   (Mr. Homlar) Did you send a copy of this to me?

18             THE COURT:  What is "this"?

19        A.   I don't know what that is.

20        Q.   Did you send a copy of the State's Response to

21   Defendant's Motion to Dismiss?

22        A.   I filed it, I believe, on the 27th, and I called you

23   about the fact that I was filing it.

24        Q.   Is there a certificate of service attached to it?

25        A.   I don't remember, Robert.  I had Gretchen do this.

1       Q.   Is your bar number on there?

2          THE WITNESS:  I mean, can I object to the relevancy

3      of this at this point?

4          THE COURT:  Do you remember --

5       A.   You know what?  On this copy that you've give me, I

6      don't know.

7          THE COURT:  No, no, no.  Hang on, hang on.  Hold up,

8      hold up, hold up.  Do you remember mailing it to him or

9      not?

10         THE WITNESS:  I do not.  I gave it to my assistant to

11     process, so I don't -- I don't, like, follow her around to

12     the mailroom.

13      Q.  (Mr. Homlar) On September 25th is when you indicated

14   you found out that there was this issue.

15         THE COURT:  September 25th, 2018?

16         MR. HOMLAR:  Correct.

17     A.   I think I stated whatever date that I received your

18   motion is the date that I figured it out.

19      Q.  (Mr. Homlar) Okay.  Well --

20     A.   I don't know.  I don't remember what date that was

21   specifically.

22      Q.   All right.  I mean looking in your response,

23   paragraph three, page two, towards the end it says, "In fact,

24   it was not until September 25th, 2018 when Defense Counsel

25   brought it to the attention of the District Attorney's Office

1    that anyone from the State became aware that the interview..."

2         A.    Okay.  Then it was September 25th.

3         Q.    Okay.  From the time you became aware until September

4    26th, 2018 at 1:25 p.m. when you called me, did you speak to

5    anyone from the Richmond County Sheriff's Office, or anyone in

6    your office about whether or not they recorded it?  Or whether

7    or not they reviewed the recording?

8         A.    Say that again.

9         Q.    From the time you found out on September 25th, 2018

10   until September 26th, 2018 at 1:25 p.m., when you contacted me,

11   did you make inquiry with Richmond County Sheriff's Office, or

12   anyone in your office about if anyone had reviewed the

13   recording?

14        A.    I don't remember specifically what time, but I do

15   remember receiving this motion and inquiring of --

16   specifically, I remember asking Investigator Grant and Pat

17   Young whether or not anybody -- and I know that subsequent to

18   that, at some point -- I don't know which came first, the

19   conversation with you or what order everything was done, but I

20   had inquired that day about whether or not anyone had reviewed

21   the recording.

22        Q.    In the conversation you had with me on September

23   26th, 2018, there were three kind of themes.  One, you

24   insinuated that I asked that my client be brought over. Do you

25   recall that?

1    A.    That I asked for -- I'm sorry?

2    Q.    That I asked that my client be brought over that

3    morning.  Do you recall that?

4    A.    No.

5    Q.    There was also -- you also indicated in that

6    conversation that I was aware of this being recorded.  Do you

7    recall that?

8    A.    Yeah, I believe I stated that you worked in the

9    D.A.'s Office long enough that you know that we record -- or

10    that the recording is started before they enter the room and

11    it's not terminated until after they leave.

12    Q.    And you also indicated that no one had reviewed it;

13    correct?

14    A.    Right.

15    Q.    How did you communicate with Investigator Grant and

16    Pat Young about whether or not they had reviewed it, or anyone

17    had reviewed it?

18    A.    I talked to them.

19    Q.    Do you remember what date that was?

20    A.    I mean, I -- the date that I got your motion?

21    Q.    Was it -- what was the form?  Was it a text, email or

22    in person?

23    A.    I don't -- it was verbally.  I don't remember if it

24    was on my phone, or I don't know if I -- we had a conversation.

25    Q.    So it was a telephone, not a text or an email?

1        A.   Correct.

2        Q.   Have you ever called of a concept called "A

3   prisoner's dilemma"?

4        A.   I mean --

5             THE COURT:  Are we staying to the topic here?

6             MR. HOMLAR:  Yes.

7        A.   I mean I don't -- I don't --

8        Q.   (Mr. Homlar) That's a yes or no.

9        A.   Are you asking me specifically?  I mean I'm certain

10  that prisoners have lots of dilemmas.

11       Q.   I'm talking about that application of game theory.

12       A.   I'm sorry, what?

13       Q.   Game theory?

14       A.   Game theory?

15       Q.   Yes.  It's a --

16       A.   I have no idea what you're talking about.

17       Q.   Have you ever heard of anything called the

18  "Prisoner's dilemma?"

19       A.   I mean, like I say, I've heard a lot of -- a lot of

20  prisoner's have a lot of dilemmas.  They write letters to me

21  all the time about their dilemmas.

22            THE COURT:  Do you mean as a term of art?

23       Q.   (Mr. Homlar)  A term of art, a specific topic.

24       A.   No.

25       Q.   Now, I was provided copies of my client's statement,

1    along with, apparently, Mr. Krepps' statement and the

2    interactions he had with his attorney, and so was the Public

3    Defender's Office.  Has Mr. Durham's office been provided

4    copies of these?

5         A.   No idea.  I mean all of our discovery is available

6    for anyone to come and copy it if they're a party to the

7    action, but with respect to Mr. Durham, I have -- I have no

8    idea.  That is usually done without my knowledge.

9         Q.   Do you know if or when he may have been told if this

10   were lost or misplaced or unavailable?

11        A.   Was he told that?  I have no idea.

12        Q.   Do you know when or if he obtained copies?

13        A.   I -- I cannot speak to anything that Mr. Durham does

14   on a daily basis, or what he has or has not obtained in this

15   case.  I have no idea.

16        Q.   And you acknowledge that the recording of an

17   attorney-client privileged conversation is fundamentally just

18   not a good idea; correct?  By the State?

19        A.   I would say it's not a good idea.  But I don't -- I

20   mean I -- it also was not done in this situation as a

21   conspiracy as you allege in your motion.

22        Q.   Okay.  Thank you.

23        A.   It was done for a legitimate purpose.

24             THE COURT:  Anything else?

25        Q.   (Mr. Homlar) Why was my client brought over on the

1    morning of the 27th, to your knowledge?

2         A.   Because he wanted to talk to -- or because he was

3    going to be inquired of on the record about his maps, the maps

4    that were in his room.

5         Q.   And do you know where the maps originated from from?

6         A.   The jail.

7         Q.   I mean do you know who wrote them?

8         A.   I have no idea.

9         Q.   Whoever wrote those maps is essentially violating the

10   tampering with evidence statute in Georgia; correct?

11        A.   I mean, I don't know who -- I mean --

12             THE COURT:  What?

13        A.   I can't answer that question.

14        Q.   (Mr. Homlar)  Whoever wrote the maps, who drafted

15   these maps up is violating the tampering with evidence statute?

16        A.   I think it's asking me for a legal conclusion.  I

17   can't -- I mean, without sufficient information --

18             THE COURT:  You're the D.A.  You can probably reword

19        it.  I'll bite.  How?

20             MR. HOMLAR:  How what?

21             THE COURT:  How would they be violating and tampering

22        with evidence statute if they drew a map?

23             MR. HOMLAR:  Well, if it's -- if the evidence is

24        created and placed with the purpose of pointing the finger

25        of guilt more at my client, just as well as if someone --

1          THE COURT:  Now that requires her to know who drafted

2      them.  That requires her to assume it wasn't him --

3          MR. HOMLAR:  Correct.  No, no, no.

4          THE COURT:  -- right?

5          MR. HOMLAR:  Yes, that would.

6          THE COURT:  Anything else?

7          MR. HOMLAR:  No, sir.

8          THE COURT:  Anything else of this witness?

9          MS. WILLIAMSON:  Yes, Your Honor.

10                         CROSS-EXAMINATION

11     BY MS. WILLIAMSON:

12         Q.   Madam D.A., is it common for your office to redact

13     discovery before it's sent out to the attorneys or the defense

14     attorneys in a case?

15         A.   We redact Social Security numbers occasionally, some

16     protected information if we believe the victims are in danger,

17     or witnesses are in danger.  We require individuals to come to

18     the office and obtain it, but, I mean, I don't -- we redact CDs

19     for trial occasionally.

20         Q.   And you stated that although the attorney-client

21     privileged conversations in this case that were recorded were

22     not done as a conspiracy, but you believe that they were done

23     for a legitimate purpose; is that correct?

24         A.   I mean it was done without my knowledge.  I don't --

25     I can't tell you what the -- I mean I don't know what to tell

1    you about that.  All I can tell you is that nobody did it with

2    the intent of surreptitiously recording an attorney and client

3    speaking to each other.  It was done because of the protocol

4    that they have in place where prisoners try to hang themselves,

5    hurt their attorneys.  Sometimes their attorneys like to bring

6    contraband to the jail, or contraband to -- there's a plethora

7    of liabilities that exist having an inmate in an interview

8    room, and the reason that it was recorded is because they

9    record every -- just like every movement within the Sheriff's

10   Office is recorded.

11        Q.   But that recording doesn't necessarily have to be on

12   a disk and then disseminated to every defense counsel in a

13   criminal action.

14        A.   Well, forgive my effort of transparency, Ms.

15   Williamson.

16             THE COURT:  What was your answer to that?

17             THE WITNESS:  I don't -- is it -- I took it as a

18        rhetorical question.  I don't -- what's the actual --

19             THE COURT:  The question is would it always have to

20        be burned to a disk?

21             THE WITNESS:  Would a interview always be burned to a

22        disk?

23             THE COURT:  No, the surveillance of the room.

24             THE WITNESS:  If it -- yeah, it would be.  The only

25        way for the -- I mean what happens is while it's

1        recording, when you hit stop, the -- it's not like we have

2        the option of saying, like, delete this or not.  I mean

3        while it's recording, it's burning to a CD.  So when you

4        hit stop, the CD spits out.  So it's not like you can say,

5        "Nevermind, don't record this to a CD," it's already

6        burned to the CD.

7            THE COURT:  Anything else?

8        Q.   (Ms. Williamson)  You couldn't use multiple disks to

9    avoid recording an attorney-client privileged conversation?

10       A.   I mean I -- there's a lot of things I suppose I could

11   do, I mean, but at the end of the day, I didn't make the

12   recording.

13       Q.   But you were there when it was made.

14       A.   I mean was I physically in the building while it was

15   being recorded?  Yes.  I was physically in the building but I

16   had nothing to do with the CD.

17           MS. WILLIAMSON:  That's all I have, Your Honor.

18           THE COURT:  Thank you.  Anything else you need to

19       talk about?

20           THE WITNESS:  No, sir.

21           THE COURT:  You can step down.  Thank you.

22           THE WITNESS:  Thank you.

23       (Whereupon, the witness is excused and steps down from the

24   witness stand.)

25           THE COURT:  Any other witnesses you want to call?

1          MS. PAINE:  No.

2          THE COURT:  All right, all the evidence; correct?

3          MR. HOMLAR:  Yes, sir.

4          THE COURT:  Okay.  Make sure you release anybody else

5     that was placed under sequestration; okay?

6               Mr. Fogus, were you wanting to do anything?

7          MR. FOGUS:  Judge, if we can have just one moment.

8     Nothing, Judge.

9          THE COURT:  Lawyers, I would like for you to

10    argue/cite things to me in writing because this is not

11    normal.  This is not something we talk about every day.

12    This isn't a motion to suppress and, you know, expectation

13    of privacy.  This is -- this is rare air.  I would be

14    happy -- if you feel like you want to argue it, I'll let

15    you argue it.  I think, though, that the more appropriate

16    thing to do would be to let you -- give you a minute to

17    gather your thoughts, basically sort of limit you to a

18    reasonable amount of information.  Don't write War and

19    Peace, but give me something that you think, "Here's a

20    case that says it doesn't matter, blah, blah, blah, blah,

21    blah."  Or admit there is no law directly on point and

22    then give me the analogy.  I want to give you all the

23    opportunity to do it at your -- somewhat at your leisure.

24               Can you do it in a week?  Is that reasonable, or

25    is that too much?

1          MR. HOMLAR:  I'm kind of playing catch-up from this

2     week, being in trial, so, I mean, if 10 days or 14 days

3     might be okay.

4          THE COURT:  It's fine with me.  I don't -- I don't --

5     I don't want to put a stupid deadline on you, but quite

6     frankly, if I don't put a deadline on you, I will forget.

7     And I hate to admit that, but that is just the truth.

8     Today is the 18th.  How about -- is Monday, the 29th okay?

9     Is sometime close of business Monday, the 29th?  Can you

10    send it to me by email, share with each other?  Is that

11    okay?

12         MS. PAINE:  By 5:00 p.m. Monday the 29th?

13         THE COURT:  Yeah, and I don't -- don't worry about

14    the time.  I mean, you know, reasonably, yeah.  Is that

15    okay?  Does that feel like you -- is that too much time,

16    not enough time?

17         MS. PAINE:  Fine with me.

18         THE COURT:  Okay with you?

19         MR. HOMLAR:  That's fine, Your Honor.

20         THE COURT:  Okay with you?

21         MS. WILLIAMSON:  Yes, Your Honor.

22         THE COURT:  And y'all aren't going to really write

23    because y'all are --

24         MR. DURHAM:  We definitely have a discovery issue,

25    but we'll be glad to take that up at a different time if

1     that's all right with the Court.

2     THE COURT:  Yeah, let's do that.  Okay, I'll mark

3     that as the 29th; close of business on the 29th, and in the

4     interim, I am going to ask that arrangements be made for

5     -- Ms. Masters, okay, I was wondering where you were.  To

6     the extent that you can identify which disks, lawyers,

7     would qualify as the attorney-client privilege, would you

8     please make arrangements with Ms. Masters and let her keep

9     them.  She's my staff attorney.  Turn them over to her,

10     all the copies that you have.  State, too, please, to the

11     -- now, that's going to -- I'm assuming y'all know which

12     disks we're talking about without having to look at them.

13     I'm not trying to get you to now look at them to make that

14     determination.  Do y'all think because -- because I was

15     going to say Lucas.  Chad said that he writes on them in a

16     very specific way and nothing else happened on that day,

17     so it would seem like whatever that date is, or whatever

18     that -- the way he marks those would be fairly

19     identifiable among the 100 disks that you have.  If you

20     can't, how about letting me know.  If you cannot, let me

21     know and I'll come up with a plan B.  Okay?

22     Anything else anybody else needs to put on the

23     record?

24     MR. HOMLAR:  Your Honor, the Palmetto Innocence

25     Project and New York Innocence Project requested to file a

1       amicus briefs in this case.  Would the Court accept those?

2           THE COURT:  I'm not going to accept any briefs from

3       anybody who is not a member of the Georgia Bar or

4       representing that man.

5           MR. HOMLAR:  Yes, sir.

6           THE COURT:  We're not going to create a firestorm.

7           MR. HOMLAR:  Yes, sir.

8           THE COURT:  If they're not representing that man, or

9       that man, or that lady, or the State, then they're not

10      writing anything.  Okay?

11          MR. HOMLAR:  Yes, sir.

12          THE COURT:  All right, good luck to y'all.  Thank you

13      very much.  They can go back with the officers.

14              All right, we'll be in recess until tomorrow

15      morning.  Thank you very much.

16      (Proceeding concluded at 4:31 p.m.)

17

18

19

20

21

22

23

24

25

1       **CERTIFICATE OF COURT REPORTER**

2              I hereby certify that the foregoing transcript

3       consisting of pages numbered 4 through 644 is a true and

4       correct transcript of the proceeding held before me; that said

5       hearing was reported by the method of Stenomask.

6              I further certify that I am not kin or counsel to the

7       parties in the case, am not in the regular employ of counsel or

8       said parties, nor am I otherwise interested in the result of

9       said case.

10             This the 26th day of October, 2018.

11

12

13      _____

14      KAREN K. CROMER, CCR-B-1485

15

16      

17

18

19

20

21

22

23

24

25