IN THE SUPERIOR COURT OF RICHMOND COUNTY

STATE OF GEORGIA

| | | |
|---|---|---|
| STATE OF GEORGIA, | * * * | CASE NO. 2017-RCCR-1165 |
| v. | * * | |
| WILLIAM KREPPS, VAUGHN AUSTIN VERDI, and EMILY STEPHENS, | * * * | |
| DEFENDANTS. | * | |

## ORDER ON MOTIONS TO DISMISS OR OTHER REMEDIES

The above-styled matter came on for hearing on October 18, 2018. All three defendants were present, represented by their respective counsel. The State was represented by District Attorney Natalie Paine. The Court received evidence and, at the conclusion of the evidence presentation, the Court took the matter under advisement and allowed the parties to further brief the issue as they wished.

## PROCEDURAL STATUS

On September 21, 2018, Defendant Verdi filed a document styled as Defendant Verdi's Motion to Dismiss or Other Remedies. Defendant Krepps also filed a similar motion shortly thereafter. Defendant Stephens did not join in the motion. The State filed its Response on September 27, 2018. Defendant Verdi filed an Affidavit of Robert T. Homlar in Support of Defendant Verdi's Motion to Dismiss or Other Remedies on October 15, 2018. Defendant Verdi and Defendant Krepps also filed a Brief on October 29, 2018. The State filed its brief on October 30, 2018.

## FACTUAL FINDINGS

These Defendants have been charged with numerous crimes related to two murder charges involving alleged victims Chad Garner and Preston Overton which occurred in June 2017. The allegations relating to the crime are not largely important to recite in connection with

this matter. However, some limited facts may prove relevant to the disposition of these motions. It is alleged that the Defendants committed two murders in connection with an armed robbery of the listed victims. The body of one of the victims has been recovered by law enforcement officials but the body of the other victim has not been recovered to date. Defendant Verdi was arrested on June 12, 2017 and has remained in custody since that date. Defendant Krepps was arrested at approximately the same date and has also remained in custody since that date. Defendant Stephens was arrested on a later date in connection with a grand jury arrest warrant and she also remains in custody.

The Defendants were indicted on September 5, 2017 and all were arraigned with the assistance of counsel on or about September 22, 2018. They entered pleas of not guilty at their respective arraignments. On April 24, 2018, the State made its initial discovery disclosure and made a supplemental disclosure on July 12, 2018. The discovery documents that were shared with counsel were quite voluminous and included approximately 100 compact discs for each defendant. The discs were made a part of the July 12, 2018 disclosure. The Defendants have appeared on numerous trial calendars since their arraignment but were not ready to try the case until the extensive discovery could be produced.

On or about February 26, 2018, the Richmond County Sheriff's Office conducted a search of the jail cells located at the Richmond County Jail and located two handwritten papers that were believed to be a map of some type. Those documents were allegedly found in the jail cell that Defendant Verdi shared with another inmate who is not involved in the crimes that these Defendants are accused of committing. It should be noted that the Richmond County Jail (occasionally referred to as the Charles B. Webster Detention Facility or by the acronym "CBW") is located at a separate location within the county, approximately 10 miles from the Sheriff's Office. The offices, which include the Criminal Investigations Division of the Sheriff's Office, are occasionally referred to by their street address of 400 Walton Way.

On February 27, 2018, Robert Homlar, attorney of record for Defendant Verdi, received a text message from District Attorney Natalie Paine requesting that he call her as soon as possible. He was in another county at the time, representing another client, and called Ms. Paine at approximately 8:43 a.m. DA Paine notified Homlar that his client was being transported to the

offices of the Criminal Investigations Division of the Richmond County Sheriff's Office. Testimony at the hearing revealed that DA Paine advised Homlar that Defendant Krepps wanted to speak with law enforcement and that jailers had found the maps in Defendant Verdi's cell the previous night. DA Paine indicated that both Defendant Krepps and Defendant Verdi were being transported to CID's offices and that he could be present if he wished. Homlar made his way to 400 Walton Way.

As Homlar was driving to the CID offices, he called Kelly Williamson, Esq. who is an Assistant Public Defender for the Augusta Circuit. Homlar had formerly served as an Assistant District Attorney and had worked in the same division with Williamson for several years. He was aware that, at the time, another Assistant Public Defender, Ms. Cawanna McMichael, was representing co-defendant Krepps but Homlar did not have McMichael's cell phone number. Homlar asked Williamson to contact McMichael and determine what was happening. It should be noted that Williamson now represents Defendant Krepps as McMichael no longer works with the Augusta Public Defender. However, on February 27, 2018, Krepps was represented by Ms. McMichael.

McMichael testified that she was on the way to her office when she received the call from Williamson and instead of continuing to her office, she drove to the Richmond County Jail and was able to speak with her client. She testified that she called DA Paine after speaking with her client and indicated that her client did not want to speak with law enforcement officials. McMichael testified that she advised DA Paine that there was no reason to transport her client to the CID offices because he did not wish to make any statement. McMichael testified that DA Paine indicated that she would speak with law enforcement and call McMichael back. McMichael then drove to her office and began her typical work day.

Homlar arrived at 400 Walton Way at approximately 9:30 a.m., and his client was already present at the CID offices. Defendant Verdi was in an interview room that was separate from the interview room that eventually housed Defendant Krepps. Homlar spoke with Inv. Lucas Grant with the Richmond County Sheriff's Office about the case and may have spoken with some other investigators. Homlar testified that, as a former prosecutor for the Augusta Circuit, he was aware that the interview rooms were generally recorded. In what will become a

very important point, Homlar testified that he asked Inv. Grant whether the room would be recorded while he was meeting with his client. Homlar testified that Inv. Grant told him the room would not be monitored or recorded while he was speaking with his client. In an affidavit executed by Homlar prior to the hearing, he indicated that Inv. Grant told him that the room would be monitored by an investigator when the lawyer was not in the room for policy reasons but that the room would not be monitored or recorded while the lawyer was in the room speaking with his client. As noted below, Inv. Grant has a different recollection of the conversation.

Homlar went into the interview room and spoke with his client. Homlar testified that he did so with the understanding that the meeting would not be recorded. Homlar indicated that he met with his client, then met with investigators, and then met with his client again. This process occurred several times that morning. He was allowed to show his client the maps that had been found and then returned the evidence to investigators.[1] DA Paine was not present when Homlar arrived and only arrived at the CID offices after McMichael arrived and spoke with her client.

McMichael indicated that she thought the issue was closed when she did not hear from DA Paine after McMichael left the Richmond County Jail. She received a message later that morning from her front desk and was told that Defendant Krepps had been transported to the CID offices. She left her office and went to 400 Walton Way. DA Paine was present when she arrived. McMichael went to the restroom but she did not see DA Paine when she came out of the restroom. McMichael testified that when she left the restroom, she asked Inv. Grant whether her meeting with Defendant Krepps would be recorded and Inv. Grant told her that it would not be recorded. She heard Inv. Grant say "cut the audio" as she was going into the interview room where Defendant Krepps was waiting. As a result of that comment, McMichael assumed that the audio portion would not be recorded but she assumed the video was continuing to be recorded. She went into the interview room and spoke with her client. DA Paine eventually knocked on the door and entered the room. Paine indicated she had some other things to attend to and wanted to know whether Defendant Krepps wanted to make a statement. McMichael reconfirmed that

---

[1] It should be noted that after the Court received copies of these Motions, the Court reviewed the video recordings in camera prior to the hearing. All of the known copies of the recording will be filed under seal with the Clerk of Court.

her client did not wish to speak with law enforcement, and they discussed potential resolutions to the case. After a short conversation between McMichael and DA Paine in the presence of the Defendant, DA Paine left the CID offices. McMichael concluded her conversation shortly thereafter, and she also left the CID offices. She did not recall seeing Mr. Homlar while she was present at the CID offices.

Homlar was present in the office of Inv. Ryan Ferguson while McMichael was speaking with Defendant Krepps. Homlar testified that the investigators were told to mute their audio while McMichael was meeting with her client. The video "live feed" continued, but Homlar was aware that the investigators were told to mute their audio while the lawyer was in the room with her client. The audio was taken off of mute once the lawyer left the room. In his affidavit, Homlar indicated that Inv. Ferguson "turned down the audio and video monitoring each time Krepps attorney [sic] entered the interview room containing Krepps and turn it on each time she left."

When he testified, Inv. Lucas Grant testified that he is in charge of this investigation. He testified that he was responsible for having Defendant Krepps and Defendant Verdi transported to the CID offices on February 27, 2018. He denied speaking with any of the Defendants on the evening of February 26, 2018 or before the recordings were initiated on February 27, 2018.

Inv. Grant testified that when Defendant Verdi was placed in the interview room, he placed a compact disc in the recording device and began recording Defendant Verdi. The recording continued throughout the time that Defendant Verdi was in the interview room, including the multiple times that Homlar went into the room alone to speak with his client. Inv. Grant remembered telling Homlar that it was the policy of RCSO to record every minute that a defendant was in one of their interview rooms for safety purposes. Inv. Grant did not recall telling Homlar that the recording would be stopped while Homlar was speaking with his client. Inv. Grant did not recall having any conversation with McMichael about the room being recorded or not being recorded. Inv. Grant was not asked any specific questions about the recording process relating to Defendant Krepps.

Inv. Grant testified about how the recording process occurs and how it occurred in this case. He indicated that if a recording is stopped, a new disc would have to be inserted and the

recording process would have to be reinitiated every time the recording was resumed. He indicated at one point in his testimony that the recordings are also saved to a hard drive but later testified that the recordings are only recorded to the disc inserted into the recording device and that the recordings are not saved to a hard drive. This discrepancy in Inv. Grant's testimony was not resolved during the hearing.

When a recording ends, Inv. Grant stops the recording on the machine and then he writes the case information on the actual disc. He then turns the disc(s) over to the evidence custodian. He acknowledged that the recordings in this case were not stopped while the attorneys were meeting with their clients. Inv. Grant acknowledged that the recording was not made in an accidental manner. He testified that it is the policy of the Sheriff's Office to record everything that occurs when a person is in the interview room. When asked to identify the written policy of the Sheriff's Office that established such a policy, he was unable to identify any provision of the written policy of the Sheriff that supported his testimony.

Inv. Ryan Ferguson testified that it was the policy of the Sheriff's Office that if a person is in the interview room, that the session must be recorded and investigators should be monitoring the recording on their respective computers. There is no ability to "live monitor" the room unless the computer program was also recording the session. Inv. Ferguson indicated that Capt. Pat Young came through the offices on the date in question and ensured that all audio monitoring was discontinued while the attorneys were meeting with their clients. He testified that he was not monitoring either the video or audio feeds while the attorneys were in the respective interview rooms but he would resume the audio and video feeds when he was aware that the lawyers were no longer in the rooms. Inv. Ferguson indicated that every investigator employed by the Richmond County Sheriff had the applicable computer program installed on their desktop computer and he has no way of knowing who is monitoring or not monitoring the interview rooms at any given time.

DA Paine indicated that she received a telephone call from Inv. Grant concerning discovery of the maps in Verdi's cell during a search prior to her initial text message to Homlar. Inv. Grant also advised DA Paine that at least one of the defendants wanted to speak with law enforcement but wanted to speak with his lawyer first. Inv. Grant asked DA Paine to contact the

lawyers for the Defendants to facilitate the conversations and she did so. She did not dispute Mr. Homlar's version of the initial notification but had no independent recollection of speaking with McMichael. She acknowledged that in an attempt to provide all relevant discovery to all parties, she personally made copies of over 100 discs for the two defendants represented by private counsel. Her policy is for the Public Defenders to make their own copies of any discovery discs they wish to copy. She indicated that she simply puts a disc received from investigators into a "cd burn tower," places the number of blank discs that are needed into the tower, and pushes the necessary buttons to have the original copied to the blanks. She does not have a monitor attached to that particular machine. She confirmed that in the process of complying with her discovery obligations, she supplied the February 27, 2018 recordings of both Defendant Verdi and Defendant Krepps to all of the Defendants. To her knowledge, each Defendant was provided a copy of both Defendant Krepps' and Defendant Verdi's statements. DA Paine confirmed that once she learned of the situation, she reached out to Capt. Pat Young who oversees CID for Richmond County and also spoke with Inv. Grant. To her knowledge, no one in law enforcement or prosecution has seen the recordings.

When asked why the Defendants were transported to CID on the date in question when she knew they did not wish to speak with law enforcement officials, she indicated that her office does not take the word of the lawyer on such matters. Instead, DA Paine indicated that the individual defendants have to personally invoke their right to remain silent in such circumstances.

As Homlar was preparing for trial, he copied all of the discovery discs to his computer hard drive and began going through all of the discovery. On approximately September 11, 2018, he became aware that his meeting with his client had been recorded. He also became aware that he was in possession of the recording of Defendant Krepps' conversations with his lawyer. He contacted Inv. Grant via e-mail and learned that the recordings were made according to RCSO policy. Inv. Grant reconfirmed that it was not DA Paine's idea to record the sessions in that e-mail exchange with Homlar.

## DISCUSSION AND CONCLUSION

At the beginning of this hearing, the Court noted that it was reluctant to be forced into a position of having to conduct this particular hearing. The criminal justice system is sufficiently complicated and difficult to navigate when all of the participants follow the well-established rules. When an officer of the court alleges that the most fundamental of rights afforded under law and under the Constitutions of both the United States and Georgia have been violated by the very people charged with enforcing those laws, the entire criminal justice system demands an appropriate response.

The Court is of the opinion that the violations raised in this case are outrageous abuses of statutory and constitutional law. These facts shock the conscious of anyone who has even a modicum of knowledge of the law. The fact that this opinion does not appear to be shared by the Richmond County Sheriff's Office or the District Attorney's Office for the Augusta Circuit is disappointing. The State seemed to focus the majority of their attention in this matter on the fact that law enforcement officers did not "live monitor" the communications between the Defendants and their respective attorneys or review the recordings after they were made. In her initial responsive pleadings, DA Paine noted, "[i]n the instant case, the State has not heard the conversation that forms the basis of the complaint, making the issue moot." That statement is simply wrong and supports the Court's conclusion that the State fails to see the larger issue presented in this case. The Court is willing to accept as true that no law enforcement official monitored the audio portion of the conversations as they were occurring. That fact completely misses the larger point.

## EVIDENTIARY IMPACT OF ATTORNEY-CLIENT PRIVILEGE

There are few rights more clearly defined than the right to counsel. Every person charged with a crime has a Sixth Amendment right to counsel. Inherent in that right is the ability of a person to discuss issues with an attorney in a manner that is confidential and privileged. As a matter of public policy, our rules of evidence have declared that attorney-client conversations are absolutely privileged. The rules of evidence have evolved to make very few communications absolutely privileged. The attorney-client privilege is one of those types of communications that are protected and have survived the evolution of evidence law.

ORDER ON MOTIONS TO DISMISS OR OTHER REMEDIES
*STATE v. KREPPS, VERDI and STEPHENS*
CASE NO.: 2017-RCCR-1165

O.C.G.A. § 24-5-501(a)(2) specifically provides that as a matter of public policy, a person seeking legal advice is entitled to prevent such a communication from being revealed. Georgia's attorney-client privilege includes not only what the client says to the attorney but also protects the advice and counsel that the attorney provides to the client. *Southern Guar. Ins. Co. of Ga. v. Ash*, 192 Ga. App. 24 (1989). However, the attorney-client privilege is not limitless. The attorney and the client are charged with the responsibility of ensuring that their communications are not overheard. The attorney-client privilege is lost if a third party overhears the conversation. *Brown v. State*, 195 Ga. App. 872 (1990). If the attorney or the client is careless and allows their communications to become known to third parties, or if a third party is brought into an otherwise privileged communication, the privilege as to that particular communication is forfeited. *Rogers v. State*, 290 Ga. 18 (2011). To be clear, a conversation between an attorney and client is not protected if it occurs in the presence of a third party, to include a law enforcement officer, prosecuting attorney, family member of the defendant, or any other third party.

The question becomes whether the privilege is waived if a party records a privileged attorney-client communication without the knowledge of the attorney or the client? The answer is that the privilege is not waived if the recording is made without the knowledge of the attorney or the client. *Sosniak v. State*, 287 Ga. 279, 283 (2010) ("The detectives stepped out of the interview room, and [attorney] and [defendant] discussed the case, apparently unaware that the video camera was still recording. The trial court properly found that [defendant's] statements here were protected by the attorney-client privilege and, thus, were inadmissible.").

As Professor Milich has noted,

> "[I]n today's world of electronic listening devices, computer snooping and telephone taps, safeguarding attorney-client confidences from a determined eavesdropper may require facilities or technology unavailable to the average attorney. [cits] Most courts have recognized this problem and have rejected the notion that one can acquire admissible evidence by stealing the adversary's confidences. [cits]"

Paul S. Milich, Georgia Rules of Evidence, §21-7 (2016-2017 Ed.). The law is clear that attorney-client communications that are recorded without the knowledge of the attorney or client are inadmissible. Privileged communications that are effectively "stolen" through surreptitious

means are also inadmissible as they violate the attorney-client privilege. In fact, under circumstances such as existed in this case, observing or recording attorney-client communications is also illegal.

## RECORDING AN ATTORNEY-CLIENT CONVERSATION IN A PLACE WHERE PERSONS CHARGE WITH A CRIME ARE INCARCERATED IS A FELONY CRIME

O.C.G.A. § 16-11-62 creates a felony crime for any person to "overhear, transmit, or record" a private conversation in a clandestine manner. The crime is known as Unlawful Eavesdropping or Surveillance. §16-11-62(2)(A) creates an exception to the general prohibition of clandestine surveillance in the setting of a "jail, correctional institution, or other facility in which persons who are charged with…the commission of a crime are incarcerated." Therefore, law enforcement officials have the right to use devices to record the activities of persons in a jail or other detention facility. However, the statute also creates a very specific "exception to the exception." §16-11-62(2)(A) further provides:

> "provided that such equipment shall not be used while the prisoner is discussing his or her case with his or her attorney."

O.C.G.A. § 16-11-69 provides that any violation of this statute is a felony crime and carries a potential penalty of 1-5 years in prison and a $10,000 fine.

At the hearing, Inv. Grant acknowledged that the conversation between attorney and client in the manner in which the February 27, 2018 conversations were conducted would constitute a private conversation in a private place, both of which are elements of the felony crime of Unlawful Eavesdropping or Surveillance. Even if he had not made that admission, the term "private place" is defined in O.C.G.A. § 16-11-60(3) as a place where there is a reasonable expectation of privacy. Under the facts of this case, the Court finds that there was a reasonable expectation of privacy in the two interview rooms on the date in question during the time that the Defendants were speaking with their respective attorneys.

There is no doubt that there are valid reasons for law enforcement officers to monitor and record the interview rooms when a defendant in a criminal case is in the room. Once a person is incarcerated, the Sheriff is charged with the responsibility of providing that person

constitutionally mandated living conditions. As Inv. Grant and Inv. Ferguson noted, it is important for the officials who have a defendant in custody to ensure that the defendant does not harm himself or have a medical emergency. However, regardless of the good intentions of any policy or CALEA guidelines, Georgia law provides that IT IS A FELONY TO RECORD ATTORNEY-CLIENT CONFERENCES. It is no defense for a law enforcement officer to claim that they were following policy. If the computer program maintained by the Sheriff does not allow for recording to be terminated when an attorney is in the room with his/her client, the Sheriff will be forced to get another computer program. If the involvement of the attorney will require multiple discs to be used in connection with this particular interview, then multiple discs will have to be used. If there is no window into the room where an officer can visually observe a person who is in the room without use of a camera, video recorder, or other "device," a window may have to be installed in the door or in the wall. If the policy requires the recording of every moment that the defendant is in the interview room to include any time the defendant is alone in the room with only his/her attorney present, then the policy must change.

In an attempt to be clear, the statute also outlaws "observing" an attorney-client conference. The evidence was less clear as to whether the witnesses who were called to testify continued the video feed while the lawyers were in the room or whether the only muted the audio portion of the live feed. Regardless of whether the investigators muted the audio or both the audio and video, the law provides that any type of "observing" an attorney-client conference is illegal. Inv. Grant made the observation that they monitor the video feed to ensure that the defendant does not assault their own attorney while the attorney is in a private conference with the defendant or that the attorney does not provide contraband to the defendant. Law enforcement officials may not use any type of "device" to conduct such an observation. The Sheriff will be required to develop an appropriate procedure to accomplish the legitimate task of protecting the lawyers and ensuring that no contraband is supplied to the defendant without the use of any type of "device."

### APPLICATION OF THE LAW TO THE FACTS OF THIS CASE

If the Court decides to deny bond in a case involving serious violent crimes, as has been done in this case, the defendant is required to remain in confinement pending trial. The only way

that an attorney representing an incarcerated individual can adequately prepare for trial is to meet with their clients in facilities maintained by the Sheriff.[2] For any of the resulting criminal trials to be lawful and legal, attorneys must be able to discuss the case with their clients without fear that the conversation is being recorded or monitored. All telephone calls at the Richmond County jail are recorded and incarcerated persons cannot have confidential telephone calls with their attorneys. In some counties, defendants have the right to make unrecorded telephone conversations with their attorney while they are incarcerated. *Rogers v. State*, 290 Ga. 18, 21 (2011). However, the Court is not aware that individuals incarcerated at the Richmond County Jail have that ability. Incarcerated individuals can only speak with their attorneys in a face-to-face manner when they are in the custody of the Richmond County Sheriff and those conversations cannot be recorded, both as a matter of law and as a matter of policy.

While the evidence in this case was contradictory on this particular point, the Court believes that Homlar was told that his conversation with Defendant Verdi would not be recorded. McMichael believed that the audio portion of the conference would not be recorded, based upon her conversation with Inv. Grant. However, it is unclear to the Court why the law enforcement officials moved Defendant Krepps and Defendant Verdi to 400 Walton Way in the first instance.

An unidentified informant allegedly told someone at the jail that Defendant Krepps wanted to make a statement after he had the opportunity to speak with his lawyer. That unknown employee at the jail then relayed the message to Inv. Grant. McMichael went to the jail and spoke with her client on the morning of February 27, 2018. McMichael told DA Paine that her client did not want to make a statement prior to his transportation of the CID offices. To be clear, a member of the Georgia bar spoke directly with Defendant Krepps before he was transported to 400 Walton Way, and she made it clear that her client did not wish to make a statement. For reasons that are unclear to the Court, the decision was made to rely upon second

---

[2] The Court is aware that there is another pending inquiry concerning recording of conversations at the Richmond County Jail. The Court has not considered that matter in deciding this case. That matter has not yet been fully investigated and involves conversations that allegedly occurred in a very different setting from the conversations being addressed in this case.

hand information from an informant instead of relying upon the direct statement of Defendant Krepps' lawyer.

DA Paine testified that she does not accept the representations of lawyers regarding the request for counsel and that defendants must personally make that determination. It is correct to assert that the right to counsel is personal and must be waived or invoked by the defendant but where there is actual evidence that counsel met with the defendant and communicated to the DA that the defendant did not want to make a statement, any resulting statement may well be inadmissible. *Potter v. State*, 283 Ga. 576, 577 (2008) ("No attorney, acting without consulting [defendant], was empowered to invoke a right of counsel for him." By implication, where the lawyer <u>has</u> met with the defendant, the lawyer <u>can</u> invoke the right to counsel on his behalf.) See *Gissendaner v. State*, 269 Ga. 495, 497 (1998).

There was no evidence that Defendant Verdi ever asked to make any type of statement. During a "shake down" search of the jail, a jailer found two maps in his cell. It seems completely legitimate that law enforcement would want to speak with Defendant Verdi about the maps found in his cell. To his credit, Inv. Grant recognized that Defendant Verdi had counsel and asked that DA Paine contact Homlar and have him present when they questioned Defendant Verdi. However, they had transported Defendant Verdi before determining whether his lawyer was even available to attend the meeting.

The Sheriff must decide how incarcerated individuals are housed and transported within the guidelines, rules, and laws that apply to incarcerated individuals. Those decisions fall within the Sheriff's authority. But if law enforcement officials, acting on behalf of the Sheriff, choose to move the incarcerated individuals to their CID offices, they must do so lawfully. That would include basic necessities as obvious as providing bathroom facilities, appropriate food and drink, and medical care. But those facilities must also include a space where an attorney-client conference can be conducted and not be recorded or monitored. That requirement is also a part of the law that applies to incarcerated individuals.

## APPROPRIATE REMEDY FOR VIOLATION OF THE LAW

Defendants Krepps and Defendant Verdi suggest that the appropriate remedy for the illegal acts committed by law enforcement in this case is a dismissal of all charges against the Defendants. That proposed remedy is as absurd as the conduct of law enforcement officials in this case. The Court finds that the State did make a purposeful intrusion into confidential communications and lacked a legitimate justification for doing so. In dicta of the decision in *Howard v. State*, 279 Ga. 166, 170 (2005) quoting *Shillinger v. Haworth*, 70 F3d 1132, 1142 (10th Cir. 1995), the Supreme Court of Georgia suggested that when the State makes such an intrusion into a confidential communication without justification, the prejudicial effect on the reliability of the trial process must be presumed. However, that presumption of prejudice is a rebuttable presumption. Despite claims made by Defendant Verdi, the Court finds that the primary purpose of having Defendant Krepps and Defendant Verdi transported to 400 Walton Way was not to surreptitiously record attorney-client communications. The purpose of their transportation to 400 Walton Way is not completely clear as discussed above, but it is clear that the primary motivation was not to record attorney-client conversations. The purpose may have been to apply pressure to Defendant Krepps and Defendant Verdi in the hopes that one (or both) of the defendants would confess. The appropriateness of that motivation is subject to legitimate debate but is not related to the actual transgression being examined in this Order. But the remedy of dismissal proposed by Krepps and Verdi is not warranted under these facts. The request to dismiss the indictment is **DENIED**.

The Court does hereby suppress any evidence that may be uncovered on or after February 27, 2018 that arguably could have been related to the illegal recording of attorney-client conferences. This suppression will encompass both use and derivative use of any statement that Defendant Krepps or Defendant Verdi may have made on February 27, 2018. The Court has accepted as true the statements of both Inv. Grant and DA Paine that no member of law enforcement has seen the recording of the statements. Given those representations, if any evidence is uncovered after February 27, 2018, the State should be able to prove a clear line between an independent source for the evidence that does not involve any information contained

in the attorney-client conferences that occurred on February 27, 2018 and any evidence that might be uncovered. The request to suppress is **GRANTED**.

Defendants Krepps and Defendant Verdi have moved to have the recordings sealed. At the conclusion of the hearing, the Court verbally ordered the lawyers involved in the case to turn over to the Court any and all copies of the recordings that were distributed as a part of discovery. The Court has received copies from counsel for the State, Krepps, Verdi and one recording from counsel for Stephens. Ms. Bray advised that she only received one disc containing these statements in the discovery process. However, the Court failed to adequately express its order at the conclusion of the hearing. The Court orders that DA Paine, as an officer of the Court, make inquiry and advise the Court whether the recording system employed by RCSO records to a hard drive or other storage system or only records to a disc. The Court recognizes that Inv. Grant is not a computer expert or even an expert on the Case Cracker software, but the Court's notes show that Inv. Grant testified that the recordings are saved to a hard drive and he also testified that recordings are only written to a disc and are not saved to a hard drive. The Court is ordering DA Paine to provide a written certification clarifying whether the Case Cracker software saves the recordings made using the program to a hard drive or other storage device. Additionally, if it is determined that the system records to a hard drive or any other type of storage system (to include the Cloud), the Court orders that DA Paine also certify to the Court, in her role as an officer of the Court, that the recordings of the statements of Defendant Krepps and Defendant Verdi have been erased from the hard drive and cannot be recovered. The Court requests that DA Paine make this matter a priority and respond via a written filing with the Clerk of Court. The Court requests that these certifications be completed within one week of this Order. If that time frame proves impossible to meet, the Court requests that DA Paine make the certifications as soon as practical after first making the Court aware of why the one-week time frame is impossible to meet.

Similarly, Mr. Homlar, Ms. Williamson and Ms. Bray/Mr. Durham shall make a written filing with the Clerk of Court within one week of this Order that certifies, as officers of the Court, that any copies of the discovery discs that they may have in their possession or under their control have been erased or otherwise destroyed. For example, Homlar testified that he saved all

of the discovery discs to his hard drive and that he supplied his client's mother a copy of the statements. Homlar shall recover any and all copies that he may have supplied to Defendant Verdi's mother, certify that she is not aware of the existence of any other copies of the recordings and certify that any copies he may have saved to his own computer system have been erased and cannot be recovered. All other lawyers involved in the case shall make similar certifications as to any copies of the recording that they may have in their possession, under their control, or which have been supplied to third parties. Defense counsel shall comply with this order in the same manner and in the same time frame imposed upon DA Paine. The Court plans to seal the recordings and file them with the Clerk of Court to ensure they are a part of the record in this case. The request to seal the recordings is **GRANTED**.

Defendants Krepps and Defendant Verdi have moved to have the District Attorney disqualified from prosecuting this case. This request is denied but deserves additional discussion for the benefit of all involved. There is no evidence that DA Paine personally committed any act of misconduct in this case. She did not review the 107 discs of information that she sent out as part of the discovery process and, under these facts, it is probably best that she did not review these particular discs. However, the appearance of impropriety in this particular case is patently obvious and would suggest that disqualification of someone would be appropriate.

The Court does not have the ability to disqualify any law enforcement witness who located evidence, took statements, made arrests, or otherwise participated in this investigation and who also violated the law in recording attorney-client conferences. While the State committed unfair acts in this case, it would be inequitable for the Court to prohibit fact witnesses from testifying.

There are two generally recognized grounds for disqualification of a prosecuting attorney. They are conflict of interest and "forensic misconduct" by the prosecuting attorney. *Williams v. State*, 258 Ga. 305, 314 (1988). Neither of those grounds exist in this case. The Court will reiterate that it finds fault with the policies of the Richmond County Sheriff's Office as were followed by the law enforcement officials involved in this case. Law enforcement officials honestly believed that muting the audio or video portion of the conferences was a proper attempt to comply with the law. They were absolutely and clearly wrong in that assessment, but they did

so in good faith reliance upon a faulty policy. The Court finds that no member of law enforcement or the District Attorney's Office entered into any type of conspiracy to violate the rights of any of these defendants. They violated the rights of these Defendants, but that was not the purpose or design of their conduct. While it is clear that someone received very poor legal advice on these issues, the Court does not believe that Defendant Krepps and Defendant Verdi were transported to CID with the express intention of setting up a clandestine recording of attorney-client communications. The Court is also convinced that DA Paine has not seen the recordings and did not review them in preparing her mandated discovery responses. The law allows the District Attorney to voluntarily recuse her office but that decision lies with DA Paine. There is no legal basis to support a forced disqualification of the District Attorney and, therefore, the request to disqualify the District Attorney is **DENIED**.

## CONCLUSION

For the reasons set forth above, the Court grants the motions to suppress any information that was included in the attorney-client conferences on February 27, 2018. The Court also does suppress any evidence that has been or may be discovered after February 27, 2018 which cannot be shown to have a source that is completely independent of the illegally recorded attorney-client conferences conducted on February 27, 2018. The requests to dismiss the charges is denied. The requests to disqualify the District Attorney for the Augusta Judicial Circuit from further prosecution of this case is denied.

The Court directs the parties to prepare the case for trial and does hereby notify counsel that the Court intends to set the case for trial on a date certain in the near future.

**SO ORDERED**, this 14 day of November, 2018.

J. Wade Padgett
Judge, Superior Court
Augusta Judicial Circuit

CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing **ORDER** by way of United States Mail in a properly addressed envelope with adequate postage affixed for safe and proper delivery to the following:

Natalie S. Paine, Esq.
District Attorney's Office
735 James Brown Boulevard, #2400
Augusta, Georgia 30901

Robert Homlar, Esq.
601 N. Belair Square, #14
Evans, Georgia 30809

Danny L. Durham, Esq.
Melissa C. Bray, Esq.
2560 Trade Center Drive
Evans, Georgia 30809

Kelly Williamson, Esq.
Office of the Public Defender
902 Greene Street
Augusta, Georgia 30901

This 15th day of November, 2018

Carson E. Masters
Judicial Staff Attorney to the
Hon. J. Wade Padgett